## NATIONAL LABOR RELATIONS BOARD v. EMPIRE FURNITURE CORPORATION.
### No. 8302.

Circuit Court of Appeals, Sixth Circuit.
Nov. 8, 1939.

Mortimer Wolf, of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Samuel Edes, and Joseph B. Robison, all of Washington, D. C., on the brief), for petitioner.

A. B. Bowman, of Johnson City, Tenn. (C. Lee Richardson, of Elizabethton, Tenn., and Simmonds & Bowman, of Johnson City, Tenn., on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The National Labor Relations Board seeks, by its petition, enforcement against the respondent of its order of January 7, 1939, directing the reinstatement of three of its employees and the payment of wages to a fourth who does not desire reinstatement, upon findings made by the Board that the respondent had been guilty of unfair labor practices including the discharge of employees for union activities. The cease and desist provisions of the order are the usual ones commanding the respondent to refrain from discouraging membership in labor organizations and coercing employees in the exercise of rights to self-organization, and also command it to bargain collectively with representatives of its employees.

The respondent challenges the validity of the order as in response to findings not based upon substantial evidence. The controversy appears here for the second time. The first order of the Board was challenged by a petition of the respondent to set it aside, filed on May 9, 1938. Subsequently, on the Board's petition, the order was remanded to it for further consideration in accord with familiar precedent (Ford Motor Co. v. N. L. R. B., 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221); was thereafter vacated and supplemental proceedings led to the present decision. The Board petitions for enforcement of its latest order,—there is no petition by the respondent to set it aside.

The respondent is engaged in the manufacture of furniture at Johnson City, Tennessee. It receives the major part of its raw materials from without the State through instrumentalities of interstate commerce, and ships much of its finished product into other States. While some question of jurisdiction was in the beginning suggested, attack upon its exercise is no longer pressed, and we conclude that the Board appropriately exercised jurisdiction.

In view of the issue and findings it seems important to consider the origin of the respondent's enterprise. It is successor to the Empire Chair Company which was liquidated in the bankruptcy court, and its plant surrendered to holders of defaulted bonds. For three years the plant was idle contributing to the distress of the unemployed in Johnson City. Through the activity of one Shumate, a retired banker and at present Secretary-Treasurer of the respondent, a new enterprise was started in the old plant through cooperation of private enterprise with community effort. The Johnson City Chamber of Commerce and the municipality gave substantial aid to it, in order to ease the local relief load; the Chamber of Commerce loaning the new corporation $17,500 to help it meet conditions for the approval of a loan by the Reconstruction Finance Corporation of $175,000, and the City aiding by remitting back taxes and lowering current assessments.

The respondent began operations in June of 1935. Up to the time the present labor controversy began it had made substantial progress, exhibiting its product at the markets in Chicago and in New York, but manufacturing principally only as orders were received. Its R. F. C. loan has been only slightly reduced. It employs a maximum of 350 men, and up to April, 1937, its relations with its employees appear to have been unattended with any difficulty or complaint on their part. Late in April one Barnett, not long in respond-

ent's employ, communicated with the Textile Workers' Organizing Committee, an affiliate of the Committee for Industrial Organization, and requested that the employees of the plant be organized into a union. A representative came to Johnson City and began the work of organization. It proceeded rapidly,—it is contended that approximately 300 men signed union cards.

■ It appears from the record that several of the respondent's foremen were hostile to unionization. While these foremen were entrusted with complete responsibility for hiring and discharging men, it by no means follows from this circumstance that an irrebuttable or even a reasonable inference arises that a lay-off or discharge was for union activity when the annual labor turn-over was 200 and there is cumulative evidence contra. We must search the record for something more substantial and definite to sustain the findings.

Our first question is whether the record substantially supports a finding by the Board that the respondent refused to agree to bargain collectively with the union if it were designated as bargaining agency of the employees in an election. The Board concluded that the respondent was fully apprised from the beginning of the activity among its employees toward self-organization; that its foremen denounced the union; threatened its members with the loss of jobs; that its officer Shumate declared an intention to close the plant if the union succeeded in organizing; that the respondent declined to recognize the union as representative without an election and expressly refused to bargain with it if designated at an election.

We explore the record for support. Winebarger, a foreman, had expressed to an employee the view that unions had never done anything to help him; that strikes had resulted from the activities of organizers in which men had been killed, and that he had seen where the CIO had caused much trouble; and Leonard, another foreman, had given it as his opinion that the CIO were "a bunch of communists fit to stir up trouble". There is no evidence that these observations reflected the view of respondent's management, that the foremen were expected to, intended, or did permit their personal views upon organization to influence them in the hiring or discharging of employees. We fail to find evidence of Shumate's declared intention to close the plant if the union succeeded in organizing. The testimony relied upon for this finding is that of the employee Morrison who was warned by Shumate that he must not solicit union members on company property or abuse those who failed to respond. He testified that Shumate said to him, "When it comes to where we can't do anything, we will lock the gate and leave out of here". While this statement was vigorously and categorically denied, nevertheless, if it was made it fails to support the finding. When industry for whatever cause can no longer function, the locking of the gate is beyond the exercise of volition on the part of management.

■ The record supports the finding that the respondent declined to recognize the union as representative of its employees without an election. We do not understand this to be a condemned labor practice when the management desires reasonable proof of majority unionization and its selection of a bargaining agency. The executive officers requested proof that those who professed to represent the men had authority so to do. They offered to produce, though they did not produce, membership cards. This would have told the respondent nothing since it had no record of employee signatures with which to compare the cards. The respondent welcomed an election. Its repeated request for an election is not controverted. It wished to have it held forthwith but the union representatives urged upon it the necessity of time within which to perfect necessary machinery for holding it.

Finally the Board finds that the respondent refused to agree to bargain with the union even if at an election it were designated as the employee bargaining agency. This finding not only flies in the face of evidence produced by the respondent through witnesses whose credibility is not impeached, but is in direct conflict with the evidence of its own representative. Virgil C. Finch, field examiner for the Board, was asked, "Q. Now, Mr. Finch, didn't Mr. Shumate and Mr. Gordon both tell you that if the election was held and it showed that the union had a majority, that they would be glad to sit down and discuss the matter around a table with a union representative? A. Probably they did, I think they did, yes."

■ We understand the binding effect of the fact findings of the National Labor Relations Board, when such findings are supported by substantial evidence. We are

not bound by findings not so supported. Washington, Virginia & Maryland Coach Company v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; Appalachian Elec. P. Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985. Substantial evidence is such relevant evidence as a reasonable mind may accept as adequate to support a conclusion. Consolidated Edison Co. v. National Labor Relations Board, 2 Cir., 95 F.2d 390, affirmed, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. In a recent case involving the validity of an order of the Board, National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13, we said, "The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power." We adhere to that view and other Circuits give approval thereto. Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100. There is no basis for the finding that the respondent would refuse to bargain with the representatives of a union certified to it as the bargaining agency of its employees as the result of an election.

The men who were ordered to be reinstated were Buchanon, a hand sander, Barnett and Hicks, while the respondent was ordered to pay Morrison a minimum amount of wages. Buchanon was laid off; he was a member of the union and had solicited others to join. There was nothing unusual in this laying off of Buchanon. His work was that of a common laborer and when there was not sufficient work the number of sanders was from time to time reduced. The Board draws the inference first that Buchanon was not laid off but discharged, and second that his discharge was for union activity, from the fact that there was a practice at the plant to pay off discharged men immediately, but to pay off those who, of their own accord leave, at the next pay day. It ignores, however, the evidence that Buchanon demanded his pay at once and it was for that reason given to him. By building one inference upon another, and by the simple expedient of rejecting controverting evidence destructive of both as not entitled to credence even though unimpeached, the Board arrived at its finding. That Buchanon was discharged and for union activity is further sought to be supported by his hearsay statement that after his discharge two additional sanders were immediately employed. To recite this evidence is sufficiently to characterize it. Buchanon testified, "the day after I was laid off they put two more men on". "Q. Are you sure of that? A. Lonnie Honeycutt said he would take the stand on it". Honeycutt was not produced and there was no explanation of his absence. We understand fully that the Board is not bound strictly by technical rules of evidence. We do not understand that this is a caveat to arbitrarily substitute surmise, suspicion and guess for proof.

Barnett was engaged in assembling table bases by means of an instrument called a "horse clamp". The method proved unsatisfactory and was discarded. Other men were assigned to assembling by a new method, Barnett being meanwhile laid off. He concluded that he was discharged and the next day called for his tools and drew his pay. His conclusion that he was discharged is not otherwise supported and there is no evidence associating the discharge, if he was discharged, to union activities. Bernie Morrison was likewise laid off because there was no further work. There is credible evidence not impeached that Morrison's work had fallen off greatly in quality and it also appears that he secreted certain patterns. The only evidence that could possibly connect his discharge to union activity is solicitation of members during working hours, and abuse of fellow workers. If so connected his discharge was not in pursuance of an unfair labor practice. We have recently pointed out, National Labor Relations Board v. Sands Mfg. Co., 6 Cir., 96 F.2d 721, that the statute does not interfere with the employer's right to discharge for violation of contract and that discharge is not an unfair labor practice merely because the discharged employee is a member of a union.

Hicks was discharged for violating a company rule against running to the time clock. A serious accident to an employee resulting from this practice and a demand by the company carrying group insurance that it cease, led to the adoption of the rule. While compliance may not always have been vigilantly enforced, the rule existed and there is cumulative evidence not only from his superiors but from his co-workers that Hicks violated the rule and so incurred the penalty of discharge threatened for its violation. There is no support for the finding of the Board that

the discharge of Hicks was due to union activities.

The petition of the board for enforcement of its order must be denied because its findings of unfair labor practices are unsupported by substantial evidence. Sensible of the great social purpose of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., courts have gone far to uphold rulings of the administrative agency charged with its enforcement, doubtless in the belief that over-zealousness must in time yield to expertness in weighing evidence and that time and responsibility must develop a judicial approach to disputed issues in a tribunal which, though administrative, exercises to such large extent the high judicial function. It may not be amiss —indeed, it may be in the highest public interest to observe that the beneficent purposes of the Act will not be effectuated by decisions such as that presently reviewed.

Petition denied.