## MIDLAND STEEL PRODUCTS CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 8318.

Circuit Court of Appeals, Sixth Circuit.

June 27, 1940.

W. T. Kinder, of Cleveland, Ohio (Jones, Day, Cockley & Reavis, W. T. Kinder, and T. M. Harman, all of Cleveland, Ohio, on the brief), for petitioner.

Alvin J. Rockwell, of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Allen Heald, and Malcolm S. Mason, all of Washington, D. C., on the brief), for respondent.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

ALLEN, Circuit Judge.

Petition to review and set aside an order of the National Labor Relations Board under § 10(f) [Title 29, § 160(f), U.S.C., 29 U.S.C.A. § 160(f)] of the National Labor Relations Act (49 Stat. 449, 29 U. S.C. § 151 et seq., 29 U.S.C.A. § 151 et seq.). In its answer the Board asks the court to enforce its order which requires that petitioner cease and desist from (1) discouraging membership in any labor organization or in any manner discriminating against employees because of membership in a union, and (2) in any manner interfering with or coercing its employees in the exercise of their right to self-organization for the purpose of collective bargaining, and that appropriate notices be posted. The order also requires petitioner to reinstate Mack Cheek as an employee, with compensation to him for loss of pay suffered by reason of his discharge. The interstate character of the operation is conceded.

The order was based upon a complaint which charged the petitioner with discharging Mack Cheek and Leon J. Murray because of union membership and activity, and also charged in substance that the petitioner had intimated and coerced

its employees by using spies; by interrogating employees and prospective employees in regard to union activity; by suggesting that their belonging to the union would be detrimental; by showing preference to non-union men in case of lay-offs; by offering inducements for ceasing union activities; by ridiculing the union and endeavoring to embarrass members of the union.

The Board reversed the finding of the trial examiner that Leon J. Murray had been wrongfully discharged, and found that no evidence of espionage existed. It made no specific 'finding as to the other charges, but the uncontradicted evidence affirmatively shows that respondent practiced no discrimination against union members in the matter of lay-offs and in the handling of seniority rights or discharges, with the possible exception of the case of Cheek, which is discussed later. Numerous employee witnesses on behalf of the Board, as well as other employees, positively stated that no foreman, supervisor, or official ever ridiculed or disparaged the union. The petitioner was entitled to a finding in its favor upon these points.

The Board bases its cease and desist order on (1) A letter dated June 3, 1937, sent to the employees by petitioner's works manager at the time of the union's organization campaign, and (2) a comment by the general superintendent to the financial secretary of the union that the men in petitioner's Detroit branch "are disgusted with unionism. * * * They have lost all of their incentive to do good work and—just disgusted with unionism in general."

In view of petitioner's fair attitude toward organized labor and toward its employees, we think that the Board's finding that this letter interfered with, restrained and coerced its employees in the exercise of the rights guaranteed under § 7 of the National Labor Relations Act is supported by no substantial evidence. It is uncontroverted that petitioner's relations with its employees have always been friendly and sympathetic. The uniform policy of the company for years has been that its employees have a right to join any organization that they care to, or not to join an organization. The requirement of continued employment with the company has always been the quality of the work done, and that alone. In April, 1934, a notice was posted throughout the plant, which stated:

"No employee is obliged to join any union. This is not required or requested by the National Industrial Recovery Act, or by any act or edict of the President of the United States. Your jobs and wages do not depend upon your membership or nonmembership in any organization of any kind.

"No employee of this Company has been or will be discriminated against in any way because he does or does not belong to any union—all employees will be treated in exactly the same manner regardless of whether they hold a union card or not.

"Every employee may take up with the Management any matter in which he is interested, just as he has in the past. He need not appoint anyone to represent him.

"You do not need to pay dues to anyone to get a square deal at Midland.

"The Company will do everything that it lawfully can do to see that no employee is coerced, misled or intimidated to make him join any union or association."

The Board finds in effect that this communication, written before the National Labor Relations Act was passed, shows hostility to the unions. There is no substantial evidence to support this finding. The communication on its face shows absolute impartiality as between union and non-union men, and such impartiality was in fact observed by the management. The statements from which the Board drew its inference are fully explained and justified by the fact that reports had been circulated that petitioner's employees must join a labor union, and this communication was issued as an answer to such reports. The same notice was mailed to each of the employees personally, and the policy expressed therein was carried out up to the enactment of the National Labor Relations Act. At that time the employees began to discuss the Act and its meaning with reference to union organization, and Wallace, the company's works manager, called together and addressed different groups of employees upon this question. They were told in effect that it made no difference to the management whether the men belonged to a union or not. The supervisory employees were instructed not to discuss organization with the men, but were told that there would be no discrimination either because of membership or non-membership in a union. The men understood this perfectly, and there is no testimony to the con-

trary. Typical of numerous statements upon this subject are the following answers of Basch:

"Q. What was your understanding out there as to whether, so far as the company was concerned, a man could join or could not join the union, as they pleased? A. Well, there is no one told me I had to join the union, or no one told me I didn't have to join.

"Q. Do you feel yourself free to join the union if you want to? A. Oh, yes."

Cheek, who was president of the union, and found by the Board to have been discharged because of union membership and activity, said upon this subject that he knew, as far as the company was concerned, it was up to the individual to decide for himself. Seven employee witnesses called by the Board, and most of them members of the union who are still employed by petitioner, testified to the same effect.

 The letter which the Board found to constitute interference, restraint and coercion, reads as follows:

"Dear Fellow Worker: During the past few weeks it has been my pleasure to have talked to the majority of you. We all realize the necessity for the closest cooperation in working out our problems.

"It has. been the policy of our company and of you to be fair in all of our associations. A continuation of this policy will bring Happiness and Prosperity to us all.

"Many of our employees have recently requested information pertaining to their rights under 'The Wagner Act.'

"Under this act you have the right to name anyone you choose to represent you. You do not have to join any organization.

"Our policy is to be fair to each employee in every way.

"I would appreciate your dropping in to my office at any time to discuss our future policies and your suggestions how to make this a happier and better plant in which to work.

"Thanking you for your interest and with best personal wishes,

"Sincerely yours,

"R. H. Wallace."

This letter speaks for itself, and on its face is nothing more than a communication informing the employees that they may or may not join a union, and that in either event petitioner will treat them impartially. The Board considered that the suggestion of "dropping into my office" was an appeal for the retention of individual bargaining, and that the letter was not an impartial resumé of the employees' rights. The pertinent provisions of the statute held to have been violated by petitioner read as follows:

§ 157, Title 29, U.S.C. 29 U.S.C.A. § 157. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

§ 158, Title 29, U.S.C., 29 U.S.C.A. § 158. "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *."

Assuming that the Board was correct in regarding the last part of the letter as an appeal to individual bargaining, the Act does not prohibit this practice. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682. We do not understand that the statute forbids the employer, where he is innocent of coercion, interference, or restraint, to suggest individual conferences with his men nor even to advocate the advantages which grow from individual conferences, nor do we understand that such a suggestion of itself constitutes an element of interference, coercion or restraint. If the statute contained any such provision a serious question would arise as to whether it violated the First Amendment of the Constitution of the United States and the employer's right of free speech. That a letter more strongly phrased than this one might "influence" some employee in favor of individual conferences is possible; but such influence in and of itself does not violate the applicable section of the statute, which only prohibits interference, restraint or coercion. Not every kind of influence amounts to compulsion. This has been declared by the Supreme Court in Texas & New Orleans Rd. Co. v. Brotherhood of Railway & Steamship Clerks, 281

U.S. 548, 568, 50 S.Ct. 427, 433, 74 L.Ed. 1034. The statute there construed provided for the appointment of representatives for collective bargaining "without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other." § 2, par. 3, Railway Labor Act of 1926, 44 Stat. 577. The court there stated that the express prohibition against the use of "influence" is not to be taken "as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. 'Influence' in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls 'self-organization.' The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this Act than in relation to well-known applications of the law with respect to fraud, duress, and undue influence."

This letter exerts no pressure. It does not express nor intimate the opinion of the employer as to the merits of unionization or of non-unionization, or as to the merits of any particular union or organization. It constitutes an effort to secure cooperation between the "front office" and the workers themselves, that is, to secure one of the objectives of the National Labor Relations Act, which, as stated in its title, is "to diminish the causes of labor disputes."

The statute does not require any or all employees to join a union. Therefore, in stating that men would not be discriminated against either for union membership or for not being union members, the letter was not unfair and did not violate the statute.

There is no evidence to support the Board's finding that the letter constituted an unfair resumé of the employees' rights. The letter did not purport to inform the employees of the various provisions of the National Labor Relations Act. It was unnecessary, and in fact would have been unwise, for the employer to attempt to summarize for his employees what they might do under the statute. They, equally with the management, were presumed to have knowledge of its provisions.

The finding of the Board that the comment of the general superintendent that the men in petitioner's Detroit plant were "disgusted with unionism" constituted evidence of interference, restraint and coercion, raises the question whether any and all statements derogatory to unions are prohibited by the Act. It is not claimed that the comment was coupled with any threat of discrimination or loss of employment. It did not interfere with or restrain attempts to organize, nor did it attempt to do so. The comment may have been either a statement of fact or an expression of opinion, or a statement embodying both elements. But neither statement of fact nor expression of opinion by the employer is prohibited by the statute, and if they were, the statute would contravene the free speech provision of the First Amendment. Bearing in mind that "the dissemination of information concerning facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution" (Thornhill v. State of Alabama, 60 S.Ct. 736, 744, 84 L.Ed. 1093, decided by the United States Supreme Court April 22, 1940), we think the same principle applies a fortiori with reference to this simple conversation wholly lacking in any element of threatened discrimination because of union membership or activity. Unless the right of free speech is enjoyed by employers as well as by employees, the guaranty of the First Amendment is futile, for it is fundamental that the basic rights guaranteed by the Constitution belong equally to every person. The use of influence amounting to interference, restraint or coercion plainly is illegal. Cf. Texas & New Orleans Rd. Co. v. Brotherhood of Railway & Steamship Clerks, supra. But where no such element exists, the employer is not precluded from conversing with employees about labor questions. As declared by the Supreme Court in Thornhill v. State of Alabama, supra,

"Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgment of the liberty of such discussion can be justified only where the clear

danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion."

The cease and desist order and the order for posting the appropriate notices thereunder must be set aside.

■■■ Upon the question of Cheek's discharge, we also conclude that the order is erroneous. Petitioner discharged Cheek on August 20, 1937, because of violation of one of its posted rules, which was placed upon all bulletin boards throughout the plant on July 7, 1937. The rule read as follows:

"Notice

"Solicitation of Any Kind Is Strictly Forbidden at any Time on Company Property Without Approval of the Management.

"Violation of This Rule Will Result in Immediate Dismissal.

"R. H. Wallace."

This was not the first statement of the rule. In 1934 a rule had been formally adopted and posted, forbidding sale on the petitioner's property of all chance tickets, and in March, 1935, a similar rule was again posted. The final paragraph of the posted notice warned "that solicitation of any kind on company property is prohibited and any employee who disregards this rule will be subject to dismissal."

It is uncontradicted that all employees generally knew of this rule, and understood that it was in force. During the period covered by this controversy, it was generally enforced against organizations and individuals, being varied in case of solicitation for such objects as flowers for funerals, for the sick, or for weddings, on express permission from the management.

Cheek understood the rule and suspected that it applied to solicitation for the union. He therefore went with a fellow-employee on July 7, 1937, to inquire of Wallace whether the rule applied to solicitation for union membership, and was specifically told that the rule included everything, and that union cards could not be passed out on the premises. Cheek admits that he violated the rule repeatedly from July 7th to August 20th, by soliciting on petitioner's property.

The Board ignores Cheek's admission, and finds that Cheek did not solicit on August 20th; that he simply called a fellow-worker a "scab." But Cheek testified that he said to Yachnak, to whom he applied the epithet, "According to the way you talk and me talking towards the organization here, you would be the only man to come back to scab if there was a strike here." This constituted strong evidence from Cheek himself of solicitation on August 20th. Five other witnesses, offered by the Board or testifying in affidavits proffered by the Board, declared in effect that Cheek on August 20th asked Yachnak to join the union, and asked him to sign a card. In view of Cheek's frank admission as to repeated solicitation, and the evidence presented by the Board, we think that its finding upon this point is not supported by substantial evidence, and that in fact the substantial evidence is to the contrary. We are not bound by such findings. National Labor Relations Board v. Empire Furniture Corp., 6 Cir., 107 F. 2d 92.

■■■ Since the rule was violated, the discharge was lawful unless the rule was unreasonable and hence null and void. The employer in his right of control over the property and the employee is authorized to make reasonable rules for the conduct of the business, and the employee is bound to obey such reasonable rules as a part of his contract of hire.

Whether this rule was reasonable is a question of law for the court to determine. Little Rock & M. Rd. Co. v. Barry, 8 Cir., 84 F. 944, 43 L.R.A. 349; Missouri, K. & T. Ry. Co. v. Collier, 8 Cir., 157 F. 347; Chicago, R. I. & P. Ry. Co. v. Ship, 8 Cir., 174 F. 353; Central Rd. Co. of New Jersey v. Young, 3 Cir., 200 F. 359, L.R.A.1916E, 927.

■■■ We think the rule is clearly reasonable. The employer has the right on his premises to demand the single-minded attention of the employee to his work. In modern industry the performance of work with efficiency and without physical danger depends not only upon the devotion of the employees to their work, but also upon the amity with which they cooperate.

The right of the employer to make reasonable rules for the safety and efficiency of the work includes his right to make such rules for the entire time that the working force is on the employer's premises. Solicitation, argument, the hurling of epithets in tense discussion before work has

been commenced or in the noon hour, may reasonably be expected to carry a certain animus over into work hours. If the rule against solicitation is reasonable, the fact that it is applied to soliciting for union membership does not relieve the employee of his obligation of obedience. Cheek was at liberty to solicit the employees outside of the plant. Inside the plant, in order to secure efficiency, harmony and safety, prior to this controversy the employer had prohibited solicitation of any kind. The rule was reasonable, as it was calculated to secure concentration of the employees on their work, and thus protect the safety of the employees. It was deliberately violated, and hence Cheek's discharge was not unlawful.

This is not a case in which a company union is allowed the use of an employer's premises in order to break down free organization among the employees. No hindrance was placed by petitioner upon the natural choice by the men themselves of representatives of their own choosing.

The order of the Board is set aside and enforcement thereof denied.