**CONSUMERS POWER CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 8180.

Circuit Court of Appeals, Sixth Circuit.
June 27, 1940.

Don T. McKone, of Jackson, Mich. (Don T. McKone, Maxwell F. Badgley, Bisbee, McKone, Badgley & Kendall, and Walter D. Kline, all of Jackson, Mich., on the brief), for petitioner.

Philip G. Phillips, of Cincinnati, Ohio (Charles Fahy, Robert B. Watts, Laurence A. Knapp, all of Washington, D. C., Philip G. Phillips, of Cincinnati, Ohio, and Bertram Edises, and David McCalmont, Jr., both of Washington, D. C., on the brief), for respondent.

Before SIMONS, ALLEN and ARANT, Circuit Judges.

SIMONS, Circuit Judge.

The initial question to be determined is the jurisdiction of the National Labor Relations Board over the petitioner under § 10 (a) of the National Labor Relations Act, 29 U.S.C.A. § 160(a), which empowers the Board to prevent any person from engaging in any unfair labor practice affecting commerce.

The petitioner is an operating utility, subsidiary of Commonwealth and Southern Corporation. It is organized under the laws of the State of Maine but confines its operations exclusively to the State of Michigan, its policies being directed from its general offices in the city of Jackson. It is actively engaged in furnishing electric energy, natural and artificial gas, central heating, and in a limited degree water, to customers located for the most part within the southern peninsula of Michigan and in geographical area which includes important industrial centers, such as Bay City, Saginaw, Flint, Jackson and Kalamazoo. As incidental to its utility business, it also sells electric appliances within its territory and operates hydro-electric developments on the Muskegon, Manistee, Au Sable and Kalamazoo Rivers. All of its electric energy is generated within the state and none of it is sold for consumption or use outside of the state. Its gas is likewise manufactured or produced and sold within the state, it having no gas lines or electric connections extending to or from any other state or crossing any state line. It employs upwards of 6000 persons, among whom are members of three union organizations, the selection of a representative bargaining agency, by a run-off election being still undecided. See International Brotherhood et al. v. National Labor Relations Board, 6 Cir., 105 F.2d 598, National Labor Relations Board v. International Brotherhood, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354.

The petitioner contends that it had, for a long time, been its established policy to confine its business activity to the State of Michigan; that in pursuance of that policy it had studiously avoided making connections with or giving service to anyone which would make it possible to constitute its business interstate in character, and as evidence of its effort to confine its operations exclusively to the state, it had required prospective purchasers of power to sever use of out-state connections before it would deliver power to such purchasers; that its transmission system has been so de-

veloped and integrated that it would remain without relation to or connection with any property or business outside of its wholly localized intra-state network in Michigan.

While the petitioner purchases fuel from points outside of the State of Michigan, its purchases during 1937, amounting to $1,-835,000, and while it buys appliances for resale from without the state amounting annually to approximately $1,300,000, it says that all appliances, materials and commodities go into stock rather than into immediate use or consumption, and are commingled with similar property already on hand, so that interstate shipments have come to rest within the state long before consumption occurs. It ships a relatively small amount of by-products such as tar, ammonia, ammonium sulphate and drip oil, outside of the state, but these by-products are insignificant, amounting to but one-twentieth of 1 percent of its gross business, and are but a mere incident rather than a primary or essential purpose of its business activities. It sells electric energy to four interstate railroads, the Ann Arbor, the Grand Trunk System, the Pere Marquette and the Michigan Central, for the purpose of lighting stations, crossings, shops and yards, for water pumping and for telegraph and signal purposes. Representatives of each of the four railroads testified, however, that if there were a complete failure of power from the petitioner there would be no substantial interruption of service on their roads. The petitioner also furnishes electric energy to the Western Union and Postal Telegraph Companies, and the Michigan Bell Telephone Company for message transmittal, time clocks and other functions, but its evidence is to the effect that the services of these utilities would not be interfered with by a failure of electric energy, and that during a strike when power was shut off in Saginaw and Bay City, the Telegraph Companies switched promptly from the teletype to the Morse system without interruption of service, while the Telephone Company has other sources of electric energy upon which it relies. As an aid to navigation, the petitioner furnishes electric energy for the operation of vehicular and railroad bridges across the Saginaw River at Saginaw and Bay City, but these bridges are also equipped for mechanical or steam operation and failure of electric power would not in anywise impede navigation.

Finally, the record shows that in the area served by the petitioner, there are over 250 private industrial plants which it supplies with either gas or electricity, either totally or in large part dependent upon petitioner's power for the continuation of normal manufacturing operations, and that cessation of petitioner's service would suspend interstate shipments of more than $20,000,000 per annum flowing into Michigan, and more than $65,000,000 per annum moving out of Michigan. Among these industrial plants are the E. I. DuPont De Nemours and Co. plant at Flint and seventeen plants of the General Motors Company. Of the latter only two, the Buick and Chevrolet plants in Flint, have auxiliary generating equipment, and these generate but 10 and 20 percent respectively, of their own requirements. Moreover, a shutdown of the plants dependent upon petitioner would cause a shut-down of the Cadillac and Chevrolet plants of General Motors in Detroit, and its Oldsmobile plant in Lansing, which, while not supplied with electric energy by the petitioner, yet depend entirely upon the Saginaw and Flint plants for parts. Not only are the General Motors plants in Michigan so dependent, but its assembly plants in 13 other states would likewise have to cease operations if the Michigan plants became idle through failure of light and power.

Confining ourselves for the moment to that phase of the petitioner's business which involves purchase of fuel and appliances shipped to it from without the state and sold or consumed wholly within the state, to its business in the sale of by-products outside the state, and to its furnishing of light and power to interstate railroads and bridges spanning navigable streams, and to telegraph and telephone companies, it would seem to be clear, under the reported decisions, that the petitioner is engaged, in a substantial way, in interstate commerce, or that the impact of a labor controversy which shuts down its plants and hydro-electric developments, would substantially and directly affect the flow of interstate commerce into and from the State of Michigan. The petitioner's contention that the interstate railroads, bridges, telegraph and telephone companies would be but momentarily affected, and that its interstate business in by-products is relatively small even though actually substantial, must, it seems to us, be rejected upon the authority of National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59

S.Ct. 668, 671, 83 L.Ed. 1014, and National Labor Relations Board v. Bradford Dyeing Ass'n, 60 S.Ct. 918, 922, 84 L.Ed. 1226, decided May 20, 1940. In the first of the references, it was said: "Nor do we think it important, as respondent seems to argue, that the volume of the commerce here involved, though substantial, was relatively small as compared with that in cases arising under the National Labor Relations Act [29 U.S.C.A. § 151 et seq.] which have hitherto engaged our attention. The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small." In the second case the court rejected the conclusion of the Circuit Court of Appeals that a business in waste products sold in interstate commerce, which did not exceed one percent of the total goods processed, was but "a mere incident" to which the maxim "de minimus" might be applied.

These activities aside, however, it seems abundantly clear that a stoppage of power supplied to the numerous plants in the great automobile industrial area, which includes Flint, Pontiac, Jackson and other cities in Michigan, the closing of which would affect other great industries in Detroit and throughout the nation, establishes the jurisdiction of the Board over the petitioner under the terms of the Act. Not only would interstate commerce be affected, but the effect would be as catastrophic as that pointed out in Consolidated Edison Co. of N. Y., et al., v. National Labor Relations Board, 2 Cir., 95 F.2d 390, 394, affirmed 305 U.S. 197, 59 S.Ct. 206, 213, 83 L.Ed. 126. The distinction which the petitioner seeks to make between that case and the present controversy is tenuous. The Commonwealth Edison Company came within the purview of the National Labor Relations Act, and under the jurisdiction of the Board, not because its customers were instrumentalities of interstate or foreign commerce, but because labor strife, which would curtail its service, would directly and immediately affect commerce. The existence in the present case of an intervening private agency over whom the employer has no authority or control, is of no moment, since it is plain that the effect on commerce would be immediate and, in a realistic sense, direct. The distinction here urged is fanciful, for in its effect upon commerce the business of the petitioner is not insulated by the mere fact that the General Motors Company and the DuPont Company are corporate entities engaged in manufacture rather than in transportation. The effect of labor strife in the petitioner's plants upon the shipment of goods from Flint, Pontiac and Detroit, would be felt immediately, and there is no sound principle by which processing of manufactured goods coming into or leaving the state, as affecting commerce, is to be distinguished from supplying power as an indispensable element in such processing. As was said by the Chief Justice in the Commonwealth Edison case, "In determining the constitutional bounds of the authority conferred, we have applied the well-settled principle that it is the effect upon interstate or foreign commerce, not the source of the injury, which is the criterion."

An added ground for the petitioner's assault upon the jurisdiction of the Board, is the alleged inadequacy of the charge which initiated the inquiry, and the inadequacy of the complaint by which the Board sought to apprise it of the unfair labor practices in which it was thought to have engaged. Particularly, it complains of the Board having taken jurisdiction upon a charge failing to conform to its own rules and regulations which (Article II, § 4) require that the charge contain the full name and address of the person or labor organization making it, the full name and address of the person against whom the charge is made, and a clear and concise statement of the facts constituting the alleged unfair labor practice affecting commerce, with the names of the individuals involved and the time and place of occurrence. It asserts that the charge accuses it of the violation of Section 8 (1), (2), (3), of the Act, 29 U.S.C.A. § 158(1, 2, 3), but in the general language of the statute, with an additional paragraph which charges that it dominated and interfered with the formation and administration of the Independent Power Employees Association, and that the complaint subsequently issued by the Board, while more elaborate in form, merely charges the petitioner with violation of the Act. It asserts that not at any time was it furnished with specific bases either for the charge or the complaint until proposed findings of fact and conclusions of law were served upon it after the termination of the hearing.

It is to be noted, in this connection, that the unions with members among the employees of the petitioner, were the United Electric Radio and Machine Workers of

America, and its successor the Utility Workers Organizing Committee, affiliated with the C. I. O.; the International Brotherhood of Electrical Workers, affiliated with the American Federation of Labor, and later, the Independent Power Employees Association, organized by the petitioner's employees, and having no affiliation. The charge was lodged with the Board on February 2, 1938, by the C. I. O. affiliate, and accuses the petitioner of interfering with, restraining and coercing its employees in the exercise of rights to self-organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for purpose of collective bargaining, mutual aid and protection, and accuses it of dominating and interfering with the formation and administration of the Independent, the domination and interference consisting of acts restraining the employees' freedom of choice, and the form or character of representation, forcing upon them the Independent and maintaining control and domination over it, and discriminating in regard to tenure and condition of employment in order to discourage membership in the affiliated unions. The complaint is, however, more specific. It charges that the petitioner, since about April 1, 1937, and down to its date, dominated and interfered with the formation of the Independent by contributing to its support, by making known to its employees hostility to the C. I. O. Union, by encouraging membership in the Independent; by giving public credit to it for having procured beneficial changes in terms of employment for which the Independent was in no way responsible; by discriminating in the tenure of employment of both ordinary and supervisory employees for the purpose of encouraging membership in it and of discouraging membership in other unions; by permitting solicitation of members of the Independent on its premises and during working hours; by permitting meetings of the Independent on its premises and giving it the use of its automobiles or gasoline for organizational purposes; by favoring its members in the assignment of desirable work and discriminating against others in the assignment of work, and by open surveillance by its executive employees of meetings of the C. I. O. Union and threats of discharge or discrimination in the assignment of work, and by other means.

While the hearing ranged over a broad field, the order of the Board now sought to be set aside and on the other hand enforced, goes no further than to direct the petitioner to cease and desist from dominating, interfering or contributing to the support of the Independent, and from interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, or to form, join or assist labor organizations, or to bargain collectively through representatives of their own choosing and engage in concerted activities for the purpose of collective bargaining, or mutual aid and protection. Its affirmative provisions direct the petitioner to refrain from recognizing the Independent in dealings concerning grievances, disputes, rates of pay, hours of employment, or other conditions of work, and direct the petitioner to post and maintain, for a period, the usual and appropriate notices. Whatever may have been the scope of the inquiry, the order is not broader than the complaint.

Under § 10(b) of the National Labor Relations Act, no complaint may be issued by the Board until there has been a charge that some person has engaged, or is engaging, in an unfair labor practice affecting commerce. The filing of a charge is therefore jurisdictional. This means no more, however, than that the Board is without power to initiate a complaint upon its own motion, but must await the filing of a charge before its powers are exercised. The Act contains no specification of what constitutes a proper charge, save that it shall state that the respondent has engaged, or is engaging in any unfair labor practices affecting commerce. It would seem clear, therefore, that the provisions of Article II, § 4, of the Board's rules and regulations, are for the information of the Board, to apprise it of the nature of the unfair labor practices alleged with sufficient particularity to enable it to determine that the charges are substantial and not frivolous, and so that it may enter intelligently upon the exercise of its exploratory powers. We must keep in mind that the statutory powers of the Board include not only the conduct of hearings and the entry of cease and desist orders, but preliminary investigatory authority necessary to a determination of the substantial character of the charge and to the formulation and issue of a complaint. There has been no lack of due process in failure of the charge to particularize specific acts as constituting unfair labor practices, when the complaint fairly apprises the respondent of acts alleged to do so. In considering the suffi-

ciency of the complaint in that respect it is necessary to bear in mind that the nature of the proceeding is not punitive but preventive and in the interest of the general public. National Labor Relations Board v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552, 557. It does not require the particularity of pleading in an indictment, declaration at law, or a bill in equity, for no security against double jeopardy or principle of res judicata commands the utmost of precision. Matters of evidence need not be recited in the complaint and a detailed knowledge of the Board's case in advance "is of slight value in a trial by hearings at intervals." National Labor Relations Board v. Remington-Rand, Inc., 2 Cir., 94 F.2d 862, 873. We are of the opinion that the charge was sufficient to confer jurisdiction and the complaint adequate fairly to apprise the petitioner of the unfair labor practices therein charged and to sustain the Board's remedial order. There was jurisdiction of the controversy.

■■ We are unable to perceive substantial merit in the petitioner's grievance at the union being permitted to participate in the proceeding through its counsel, or in its complaint that the conduct of the hearing was improperly delegated by the trial examiner to persons and agencies unknown to the petitioner, by the announced determination of the examiner to request a ruling upon debatable points from "Washington." Section 10(b) of the Act provides that persons other than the respondent may be allowed to intervene in the proceedings and to present testimony in the discretion of the member, agent or agency conducting the hearing. The Board's rules and regulations (Article II, § 19), provide for formal intervention, but Article II, § 25, provides that any party shall have the right to appear at such hearing in person, by counsel, or otherwise, to call, examine and cross-examine witnesses, and to introduce into the record documentary or other evidence. The report of the examiner is merely a recommendation subject to review by the Board, and it is the Board's findings and order that are here in issue, and not the examiner's recommendation. If the findings are supported by substantial evidence and sustain the order it becomes our duty to direct enforcement. It is not contended that the Board, in making its findings, was in any way influenced, coerced or intimidated by improper conduct of the union's counsel at the examination. We find nothing in Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738, or in National Licorice Co. v. National Labor Relations Board, 60 S.Ct. 569, 84 L.Ed. 799, in conflict with the view herein expressed.

■ When the trial examiner indicated his intention to ask for instructions from Washington, the inference was, of course, inescapable that he desired instructions from the Board. His announced purpose was to save possible reversal upon questions which had never before been brought to his attention. We are unable to perceive in this announcement or in the practice, anything prejudicial to the petitioner, or in denial of due process.

■ We come finally to the contention most strongly urged as ground for setting aside the Board's order, that there was lack of substantial evidence to support findings of interference with or coercion of employees in the exercise of rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, or to support findings that the petitioner dominated the Independent contrary to the provisions of § 8(2). It may be conceded at the outset, that many specific findings of fact to be culled from the discursive decision of the Board, are unsupported otherwise than by surmise, suspicion, or guess, as condemned by us in National Labor Relations Board v. Empire Furniture Corp., 6 Cir., 107 F.2d 92. But with these eliminated there remain findings of coercion and domination based upon substantial evidence which support the decision and order of the Board. No purpose will be served by detailed review of the voluminous record made at the hearing. The investigation went far afield and much that is irrelevant and unimportant is incorporated, while unnecessary latitude was undoubtedly permitted the union attorney in his examination and cross-examination of witnesses. There remains, nevertheless, substantial evidence that Markle, an important supervisory employee, in charge of more than 20 line crews operating within the Jackson division comprising some 300 men, went far beyond the bounds of that strict neutrality asserted to be the petitioner's labor policy, in coercing employees to refrain from membership in the union, and in disciplining union organizers by transfers to undesirable work in the so-called "pole yard." It is not necessary at this time to consider whether Markle's anti-union utterances transcended the limits of free speech, con-

stitutionally guaranteed, for Markle's intimidation and disciplinary measures were not mere expressons of opinion. Likewise is it unnecessary to consider whether foremen in charge of single line crews of one to ten men, are such supervisory employees that their anti-union acts may reasonably be attributable to the employer. Markle had much higher authority and was of much greater importance in the petitioner's organization than such line foremen, and so perhaps were others.

It may well be, as contended by the petitioner, that its officers took seemingly appropriate steps to suppress the anti-union activities of Markle, and that they endeavored, in the utmost of good faith, to be wholly impartial with respect to union organization and to redress grievances as soon as they were apprehended. The National Labor Relations Act, however, empowers the Board to protect employees in their right to organize and select representative bargaining agencies when such rights have been invaded, and we are unable to say, as a matter of law, that the Board should have relied upon the continued neutrality and impartiality of the petitioner for the protection of such rights, once there was substantial evidence that they had been over-ridden.

The contention that the several anti-union acts of Markle, and other supervisors amounting to intimidation, were not authorized and were beyond the scope of authority entrusted to these men, must be rejected, not necessarily upon a strict application of the doctrine of respondeat superior as it has been applied in private controversies arising out of tort or contract. It has repeatedly been noted that the National Labor Relations Act contemplates the protection of the public rights which it creates and defines, and that its power to command affirmative action is remedial and not punitive. Natl. Licorice Co. v. National Labor Relations Board, supra; Consolidated Edison Co. v. National Labor Relations Board, supra. As said by us in National Labor Relations Board v. Colten, 6 Cir., 105 F.2d 179, 182: "The essential nature of regulatory statutes of the class here considered, and the scope and purpose of administrative orders made in exercise of powers conferred by such legislation. They are to implement a public social or economic policy not primarily concerned with private rights, and through remedies not only unknown to the common law but often in derogation of it." See also Ag-

wilines, Inc., v. National Labor Relations Board, 5 Cir., 87 F.2d 146, 150.

It would seem to us, in view of the public rights involved and the remedial nature of the proceeding designed for their preservation and protection, that acts of coercion and intimidation by supervisory employees may be restrained and their resumption interdicted by appropriate action of the Board, even in the absence of clear demonstration of prior authorization or subsequent ratification, at least where the circumstances are such as to induce in subordinate employees a reasonable apprehension that the acts condemned reflect the policy of the employer. The right freely to organize without coercion or intimidation, is an empty one unless there is authority under the statutory scheme to safe-guard it, and the necessity for doing so calls for more appropriate action by the employer than mere declarations of neutrality and impartiality, even though in good faith proclaimed. Further than that we need not go for purposes of present decision.

The evidence in respect to alleged domination of the Independent, is not so clear as is that of attempted coercion by Markle of the union members by means of disciplinary transfers, and much that is sinister has been read into acts that might well have been perfectly innocent and conform to petitioner's reiterated policy of neutrality and impartiality. It must be considered, however, in relation to intimidation of union men definitely ascertained, and the failure of supervisory employees to make disciplinary transfers of officials of the Independent similar to those made of officials and organizers of the union. So considered, there is room for reasonable inference that the petitioner was tolerant of the one organization in proportion as it was intolerant of the other. Whether the court would draw that inference from the established facts, is unimportant. It is sufficient if it be an inference permissible to the Board, and if so the finding must be sustained, whatever may be our own impression of the persuasiveness of the evidence.

In view of the broad authority given by the Act to the National Labor Relations Board to take evidence and make findings of fact unfettered by the strict rules that govern judicial inquiry, and in view of the liberality accorded to its concept of substantial evidence and reasonable inference in the more recent cases, includ-

ing Consolidated Edison Co. v. National Labor Relations Board, supra; Natl. Licorice Co. v. National Labor Relations Board, supra; and National Labor Relations Board v. Bradford Dyeing Ass'n, supra, we are constrained to hold that there are findings of the Board supported by substantial evidence which sustain its order.

The petition to review is overruled and a decree may be entered for enforcement.