## NATIONAL LABOR RELATIONS BOARD v. MYLAN–SPARTA CO., Inc., et al.

No. 10458.

Circuit Court of Appeals, Sixth Circuit.

Feb. 10, 1948.

McALLISTER, Circuit Judge, dissenting in part.

———◆———

Jack G. Evans, of Washington, D. C. (David P. Findling, Ruth Weyand, Fannie M. Boyls, Dominick L. Manoli, and Samuel M. Kaynard, all of Washington, D. C., on the brief), for petitioner.

Cecil Sims, of Nashville, Tenn. (Cecil Sims, of Nashville, Tenn., on the brief), for respondents.

Before MARTIN, McALLISTER, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The petitioner, National Labor Relations Board, seeks enforcement of its order of August 26, 1946, pursuant to Section 10(b) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. By the order in question the respondents, Mylan-Sparta Company, Inc., Mylan Manufacturing Company, Inc., and M. C. Wallace were ordered to cease and desist from interfering with, restraining or coercing the employees of the two companies in the exercise of the right to form or join United Construction Workers, UMWA, or any other labor organization, that the corporations make whole to seven employees any loss of pay suffered by reason of their discriminatory discharge, that the corporations post appropriate notices, and that Wallace publish in the local newspaper a notice stating that he would not interfere with or coerce the employees in the exercise of their right to self-organization and to join a labor organization. Wallace was not an officer or an employee of either corporation.

■■■■ The Board's complaint and amended complaint were issued January 23, 1946 and February 7, 1946 respectively. The Board's order was entered August 26, 1946. The petition for enforcement was filed April 12, 1947. Following the enactment of the Labor Management Relations Act of 1947, 29 U. S. C. A. § 141 et seq., effective August 22, 1947, the respondents on December 1, 1947 moved in this Court to dismiss the petition for enforcement on the ground that the record failed to affirmatively disclose that the United Construction Workers, an affiliate of United Mine Workers of America, upon whose charge the complaint was based, had complied with § 9(f), (g) and (h) of the Labor Management Relations Act of 1947. In the alternative, respondents stated that the Union had failed and refused to comply with such requirements and asked leave to adduce evidence before the Board showing such noncompliance, and that in the event such noncompliance is shown it is contended this Court is without jurisdiction to proceed further in the cause. We believe this motion, assuming for the purposes of the motion that the United Construction Workers has not complied with the provisions of § 9(f), (g) and (h) of the Act, should be overruled. These sections provide that no investigation shall be made by the Board and no labor organization shall be eligible

for certification until certain information respecting the organization, operation and finances of the union has been filed with the Secretary of Labor, and also that no complaint shall be issued pursuant to a charge made by a labor organization unless such information has been supplied and an affidavit by the officers of the union disclaiming Communist beliefs or affiliations has been filed with the Board. The furnishing of the information and the filing of the affidavit are conditions precedent to the filing of a complaint under the 1947 Act. The complaint in the present case was not filed under the 1947 Act but was filed under the provisions of the National Labor Relations Act of July 5, 1935, 29 U. S. C. A. § 151 et seq. The amendment of the 1935 Act by the 1947 Act did not release or extinguish any of the liabilities which had been incurred under the original act. Such liabilities are expressly reserved by 1 U. S. C. A. § 29. See United States v. Reisinger, 128 U.S. 398, 9 S.Ct. 99, 32 L.Ed. 480; Hertz v. Woodman, 218 U.S. 205, 217, 218, 30 S.Ct. 621, 54 L.Ed. 1001. In any event, the complaint in this proceeding had been issued, the decision and order of the Board had been entered, and the petition to enforce the order been filed before the effective date of the 1947 Act, which by its express terms, insofar as it applies to this issue, merely provides "no complaint shall be issued." The Act is prospective, not retroactive, in its effect. N. L. R. B. v. National Garment Co., 8 Cir. 1948, 166 F.2d 233, decided January 7, 1948; N. L. R. B. v. Whittenburg and Dougherty, d.b.a. South Texas Produce Co. 5 Cir.1947, 165 F.2d 102; In the Matter of Marshall & Bruce Company, 75 N.L.R.B., No. 13, 21 L.R.R.M. 1001.

The complaint charges the respondents with engaging in unfair labor practices within the meaning of § 8(1) and 8(3) of the National Labor Relations Act. In addition to proceeding against the employing industry, it also named as respondents the Sparta-White County Chamber of Commerce of Sparta, Tennessee, and M. C. Wallace, James R. Tubb, Jr., and Robert J. Snodgrass, three individual residents of Sparta. Sparta is a town of approximately 2500 population. The employing industry is engaged in the manufacture and sale of men's and boy's shirts and is the principal industry in the town, employing between 600 and 800 persons. The businessmen of Sparta were vitally concerned with its continued and successful operation. A possible organization of a union was prevented by some of them in 1942. In February 1945, when an expected wage increase for some of the employees did not materialize, a group of about 50 to 75 employees started to walk out of the plant but were persuaded by the plant superintendent to return to work. About March 1, 1945, two organizers of the union arrived and started the distribution of union membership application cards to employees at the plant. A meeting of some of the businessmen of Sparta was held at Wallace's home. Charles Bassine, plant manager and part owner of the business, and R. E. Knowles, a former sheriff, were present. It was suggested that some of the businessmen of Sparta attend a meeting of the employees at the plant. Bassine arranged to address the employees at the plant at about 4:00 p.m. on March 9th. Bassine told the employees that he understood that there were union organizers interested in obtaining their membership in a union, that they had the right to join a union, and also the right not to join a union. He appealed for continuing production, urged that the employees not walk out even though they had the right to do so, and stated that while the plant might be closed for reasons beyond his control it would not close by any act of his. Some 50 or more businessmen, including Wallace, attended the meeting. When Bassine finished his talk and the meeting started to break up Wallace called for attention and made a talk to the employees remaining to listen to him. Wallace told them about the coal mines located nearby having closed in previous years by reason of the organization of a union and about the silk mill that had previously been located in the same building having also closed on account of union activities, that the employees should listen to friends instead of strangers, and expressed the opinion that union organization in the Mylan plant would result in the ultimate closing down of the plant. Bassine

did not make any additional statement after Wallace concluded. On March 15, 1945, the union held a meeting in the yard of Ora Burgess, one of Mylan's oldest employees, at which officers were elected. Between March 13th and March 19th, the following employees were discharged: Pauline Anderson, Carrie Bennett, Della Fletcher, Nola Martin, Mary Hardie and Rebecca Bell. Ora Burgess was discharged on April 12th. All seven of these employees were active in the organization of the union.

When the union organizers first arrived in Sparta they talked to Herman Anderson, an employee who undertook the distribution of union membership application cards, became an active union supporter and later its president. At lunch time on March 7th, Anderson found a memorandum attached to his timecard saying "Call Operator 27, Atlanta, Georgia, at lunch" and also "See Ed Knowles at City Hall." The customary way of delivering a message to an employee was to attach such a memorandum to his timecard. Anderson called the Atlanta operator and talked to his brother. After getting lunch he went to the City Hall and saw Knowles. Knowles urged Anderson to abandon the union and to tell the organizers to get out of town; offered Anderson another job and told him that the factory wouldn't run if a union came in. Knowles talked in a similar way to Mary Hardie, another active union adherent, as she left the plant that afternoon. That evening Knowles, accompanied by the sheriff, went to Anderson's home. He had a typewritten list of Mylan's employees and urged Anderson to indicate which of the employees were leaders of the union. Anderson refused to do so. Knowles asked Anderson to attend a meeting with Bassine and other businessmen which Anderson declined to do. The next evening Knowles and the Chief of Police came to the home of Anderson's father-in-law and talked to Anderson again, telling him "to stop fooling with the union." Knowles and the chief of police watched from a close distance the union meeting on March 15th, and following the meeting trailed the two union organizers and arrested them for reckless driving. After they were fined by a Justice of the Peace, Knowles ordered them to get out of town and offered them protection to the county line. The organizers left immediately.

During the organization movement, Feinstein, the plant superintendent, repeatedly told employees that his boss didn't want the union and that he would be better to them than the union would be. On one occasion an employee, Myrtle Bussell, who had not joined the union, asked Feinstein for a raise. Feinstein at first refused but after the employee talked with Bassine Feinstein agreed to a five cent raise and told her, "You are one lady, you never joined a union, and never walked out. I am giving you top price. You have a job here as long as this mill runs." She was later discharged on July 22, 1945 for alleged defective work. A forelady, Maud Hale, told employees: "They have got that old union started in here again and the one that started that union oughtn't to be fired, they ought to be kicked out." Another forelady, Della Goodwin, let it be known that Feinstein had said that he would see to it that those who hadn't signed with the union would work "if he had to call a militia."

A reading of the evidence in its entirety shows that it is amply sufficient to sustain the cease and desist order against the employing industry. We recognize respondents' contention that the businessmen of Sparta and its Chamber of Commerce have the right to take an interest and a position in a matter affecting the welfare of the community, and that their activities in support of their position can not be attributed to an employer in the absence of proof that they were inspired by the employer. N. L. R. B. v. American Pearl Button Co., 8 Cir., 149 F.2d 311, 317, 318. We also recognize the right of the employer to express his views concerning the advantage and disadvantages of unions, as exercised by the plant manager and by Wallace at the meeting of the employees. N. L. R. B. v. Ford Motor Co. 6 Cir., 114 F.2d 905; N. L. R. B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556, 563–566. But irrespective of those phases of the case there is substantial evidence in support of the

finding that the employing industry was guilty of the unfair labor practices prohibited by §§ 8(1) and 8(3). The activities of its supervisory staff, particularly in advising employees of the management's opposition to the union and in rewarding a non-union employee for not having joined the union, the cooperation of the plant manager with the businessmen openly and actively opposed to the establishment of the union in that community, the action of Knowles, whose unofficial affiliation with the management seems established, in actively fighting the formation of the union, and the prompt discharge of several union leaders without real cause justify the findings of the Board to that effect. The activities of the supervisory staff referred to were not of the sporadic, isolated type, promptly repudiated by the management, as were held not chargeable to management in N. L. R. B. v. Clinton Woolen Mfg. Co., 6 Cir., 141 F.2d 753, 757–758. Rather they are more correctly viewed against a background of employer hostility to unionization where the circumstances were such "as to induce in subordinate employees a reasonable apprehension that the acts condemned reflect the policy of the employer" in which case the employer is called upon for more appropriate action than mere declarations of neutrality even though made in good faith. Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, 44.

The Board dismissed the proceedings against the Chamber of Commerce and the individuals Tubb and Snodgrass, who were not connected with the company. We are of the opinion that it should also have dismissed them against Wallace. Although its finding that Wallace was acting in the interest of the employer and so subject to the provisions of the Act, as provided by § 2(2) thereof, is supported by substantial evidence, we are of the opinion that Wallace's speech at the employers' meeting did not transcend his right of free speech. The Board's characterization of it as "an openly anti-union speech" is not sufficient to condemn it. An employer may express his hostility to a union and his views on labor problems or policy, providing he does not threaten or coerce his employees. N. L. R. B. v. Ford Motor Co., supra; N. L. R. B. v. Brown-Brockmeyer Co., 6 Cir., 143 F.2d 537, 542–543; N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 152 F.2d 198, 202; N. L. R. B. v. J. L. Brandeis & Sons, supra. The record fails to show very definitely what Wallace said or the exact words used, the evidence dealing mostly in generalities and conclusions. This, in itself, is a failure to comply with the rule announced by this court in N. L. R. B. v. West Kentucky Coal Co., supra, that partial quotations from a speech are not sufficient to sustain the burden of proof. What the record does disclose shows truthful references to the history of the union movement in Sparta, and his opinion that the present movement would cause the same result. Prophecy is not in itself a threat or coercion. Wallace was not a part of the company management and had no authority or power to change prophecies into realities.

We are of the opinion that the evidence is sufficient to sustain the findings of the Board that the employees Pauline Anderson, Della Fletcher and Nola Martin were discharged because of their union activities in violation of § 8(3) of the Act. In the case of each of these employees the employing industry relied upon the excuse that the particular kind of work which the employee was engaged in ran out. But in each instance the employee was an experienced worker, capable of doing work in another department. The employing industry was under great pressure from the Government to maintain production on its war contracts and was employing new inexperienced employees. Considering these facts in connection with the facts that Pauline Anderson was the wife of Herman Anderson, who was the original leader of the labor union movement, that Della Fletcher indicated her willingness to transfer to another department, and that Nola Martin was promptly replaced by another employee on the same kind of work, we believe the Board's findings in these three cases should not be set aside. However, we also believe that the discharges of Carrie Bennett, Mary Hardie, Rebecca Bell and Ora Burgess were justified by the circumstances in each case. It is settled that the National Labor Relations Act does not furnish a guarantee

against discharge by an employer merely because the discharged employee is a member of a union. N. L. R. B. v. Sands Mfg. Co., 6 Cir., 96 F.2d 721. N. L. R. B. v. Empire Furniture Corp., 6 Cir., 107 F.2d 92. The Act does not take from the employer the right to make and enforce reasonable rules for the conduct of the business and to take disciplinary action against employees who either violate the rules, are inefficient or malcontent, or for reasons generally are not suitable for efficient production. The Act does not authorize the Board to substitute its own ideas of discipline or management for those of the employer, except barring discrimination or discharge for union membership. Midland Steel Products Co. v. N. L. R. B., 6 Cir., 113 F.2d 800; Wyman-Gordon Co. v. N. L. R. B., 7 Cir., 153 F.2d 480, 485-487; N. R. L. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260, 267. Carrie Bennett, although a thoroughly experienced employee, consistently failed to make her production. After her reemployment in February 1945, for five consecutive weeks before being let out she failed to make the minimum rate, requiring the Company to make up a weekly deficiency of from $4.14 to $10.63. She admitted her consistent failure to make production but claimed she had worked in other factories which didn't require production and many other employees didn't make production either. She also admitted that she spent time during her work talking loudly to other employees about the union, and testified, "I mean I talked plenty loud," because of the instructions from the union organizer not to be backward about doing it. Such conversation with other workers not only was partly responsible for her own failure to make production, but also interfered with obtaining the best work from other employees. See Midland Steel Products Co. v. N. L. R. B., 6 Cir., 113 F.2d 800, 805, 806. The Company's answer to the complaint stated that her production was so low in comparison with her ability it was finally obliged in order to correct the situation to terminate her services. It also introduced records, which were not denied, showing the discharge of 87 other employees for failure to make the required production. The fact that other companies did not require production is immaterial, and the Company was justified in adopting a policy of permitting new inexperienced employees to fail to make production without discharge while insisting on experienced employees giving their best efforts to their work. Although she denied the Company's claim that she was given several individual warnings, yet she admits that a forelady prior to her discharge conveyed to a group of them a message from the plant superintendent that he couldn't take the production he was getting. These undisputed facts justified the disciplinary action taken by the Company. Mary Hardie admitted leaving her place of duty and going to the washroom in an entirely different portion of the building on several occasions where she met other employees to whom she gave union application cards. She admitted that it interfered with the production of the factory. Although most of the employees did not work on Saturday, yet at times some of them upon request would agree to do so. Rebecca Bell agreed to work on a Saturday, but later at her home changed her mind for personal reasons and did not report with a resulting disruption in the amount of work planned for her and other employees on that day. Ora Burgess, after working the first three days of one week, left without excuse in the middle of the day on Thursday to do some washing at her home which was usually done on Saturday. When the assistant plant superintendent instructed her to get permission from the superintendent she stated to him, "I will see nobody," and left. She testified on cross-examination with reference to her talk with the assistant, "No, I didn't tell him I wanted to go. I told him I was going." In view of the undisputed character of the evidence in each of these four cases, we believe that part of the Board's order that directed these four employees be made whole was erroneous and should be set aside.

The order of the Board will be modified as above indicated and as so modified will be enforced.

McALLISTER, Circuit Judge (dissenting in part).

I concur with the foregoing opinion except with respect to the matter of Carrie

Bennet. She was not discharged for propagandizing or disturbing or hindering other workers in the performance of their duties, but solely for failure to "make her production." But although she admitted she did not make such production, a comparison of her record with that of other trimmers shows that she was far more efficient than a majority of her fellow employees, and actually produced more than most of the other workers performing similar work. The company first registered its complaint about her production record on the day after she had become an ardent and enthusiastic charter member of the union. I am of the opinion that the findings of the Board that she was discharged for union activities are sustained by the evidence.