## NATIONAL LABOR RELATIONS BOARD v. BROWN–BROCKMEYER CO.

### No. 9656.

Circuit Court of Appeals, Sixth Circuit.

May 31, 1944.

538

Louis Libbin, of Washington, D. C. (Alvin J. Rockwell, Howard Lichtenstein, Ida Klaus, and William T. Whitsett, all of Washington, D. C., on the brief), for petitioner.

John M. Sprigg and R. A. Argabright, both of Dayton, Ohio (Carroll Sprigg, of Dayton, Ohio (deceased), on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order issued May 29, 1943, in which it found that the respondent has engaged and is engaging in unfair labor practices affecting commerce within the meaning of § 2(6) and (7) and § 8(1) and (2) of the National Labor Relations Act, 29 U.S.C.A. §§ 152(6, 7), 158(1, 2), and directed the respondent to·cease and desist from the unfair practices and to take certain affirmative action. The Board found that the respondent discouraged membership in the United Electrical, Radio and Machine Workers of America, Congress of Industrial Organizations affiliate, hereinafter called the Union, and dominated and interfered with the formation and administration of the B-Line Employees Association, hereinafter called the B-Line, by facilitating its initiation and by openly favoring it over the Union, as well as by openly discrediting the Union. The respondent contends that there is no substantial evidence to support these findings.

Respondent, an Ohio corporation with its principal office and place of business in Dayton, Ohio, manufactures small electrical motors, grinders and buffers. During at least part of the period in question it was engaged in war work under

contract with the United States Army and Navy. In November, 1940, the Union notified the respondent that it claimed a majority representation in respondent's plant, which had between 300 and 400 employees. Shortly thereafter, on or about November 28, 1940, a number of employees took steps to form the B-Line, which later, through its attorney, wrote various letters to respondent, claiming that it had majority representation, and demanding that respondent recognize the B-Line as the exclusive bargaining agent. The respondent communicated with the Board's Cincinnati office, and Lionel J. Silverman, a field examiner of the Ninth Regional Office of the Board, was assigned to investigate the matter. Silverman testified that the B-Line had something over 200 membership cards, to which he had no objection. Under his recommendation an agreement was made between the Union, the B-Line and respondent, by which a consent election was held March 4, 1941, as a result of which the Union was designated as the bargaining representative by a majority of the employees. Thereafter, on June 5, 1941, the respondent executed a collective bargaining agreement with the Union while the B-Line lapsed into inactivity. The contract called for a basic eight-hour day and forty-hour week, with time and a half for overtime, and double time for specified holidays. Except for a five cent per hour wage increase, the terms and conditions of the contract were similar to the respondent's past practices.

At Thanksgiving time in 1941 the respondent, which was then doing 100% war work, received a letter from the War Department, asking it to work on Thanksgiving Day. As the Union contract called for double time on holidays, and as the prices which respondent was entitled to charge had been frozen as of September 1, 1938, under request of the Office of Price Administration, respondent proposed to the Union that the employees work on Thanksgiving Day for time and a half, but the Union refused to accept the proposal. This incident was not mentioned in the findings of either the examiner or the Board. About December 24, 1941, respondent received separate letters from the War and Navy Departments, requesting that it work on New Year's Day, 1942. The letter from the Navy Department closed with this sentence: "Kindly post this appeal in a prominent place for the information of all employees," and the letter was posted

in accordance with the request. A poll conducted by respondent showed that practically all the employees were willing to work on the holiday. Respondent wrote the president of the Union, suggesting that the shop work on New Year's Day, and requesting the Union as bargaining agent to waive double time for New Year's Day and agree to work for time and a half. The Union again refused, and this refusal was resented by many employees.

In the latter part of December, 1941, respondent received a request from the Air Corps, as well as the War and Navy Departments, to work overtime. Certain of the work is performed by women, and under § 1008-2 of the General Code of Ohio, women were forbidden to work more than eight hours in any one day or forty-five hours in any one week, or more than six days in a period of seven consecutive days. The respondent wrote the Department of Industrial Relations at Columbus, Ohio, asking permission for women to work more than the statutory maximum, and was granted this permission under date of January 3, 1942, up to and including February 28, 1942. On February 20, 1942, respondent again wrote the Department of Industrial Relations, renewing its request that women be allowed to work overtime, stating that it had made a survey of its women workers and that only one objected to working overtime. This was Pearl James, chief plant steward of the Union, who in February, 1942, filed a grievance with the respondent, protesting on behalf of the Union the working of women more than eight hours any one day or more than forty-five hours in a week. The same woman, as C. I. O. representative from respondent's plant, attended a labor conference at Columbus, which protested against women working overtime. March 4, 1942, respondent received a letter from the Department of Industrial Relations denying the request.

During 1941 respondent reduced working hours of the employees, making the working time of both men and women eight hours a day, thereby eliminating overtime pay. The employees were dissatisfied over loss of the opportunity to work overtime, and in April, 1942, the B-Line resumed its activity, advocating overtime work for both men and women, to be compensated by time and a half. Petitions for overtime were signed by a substantial number of the respondent's employees. August 3, 1942, a second consent election was

agreed upon between the respondent, the Union and the B-Line, to be held August 20th. The consent election was postponed by the Board's regional director because of charges of unfair labor practice filed by the Union. These charges grew out of the dismissal of Edith Rowland, an employee whose discharge was found by the trial examiner and the Board in these proceedings not to be unlawful. The B-Line struck in protest of the cancellation of the election for half an hour before closing time on August 20th, whereupon respondent closed the plant for the remainder of the day shift. The members of the B-Line returned to work the following morning.

The trial examiner found that the closing of the plant was a lockout against the employees who were unfavorable to the B-Line. The Board did not agree with this finding. It pointed out that the walkout resulted in considerable confusion and that because of the resulting commotion a number of non-striking employees found it difficult to continue operations. It found on the record that only a few of the plant operations could be performed independently of the well integrated conveyor system, and therefore concluded under all the circumstances that in shutting down its plant on August 20, 1942, the respondent did not violate the Act. However, it found that the respondent's conduct in bypassing the Union and taking individual polls of the employees in December, 1941, and February, 1942, on matters which were proper subjects for collective bargaining, tended to discredit the Union as a bargaining representative and lowered its prestige in the eyes of its constituents, and that by the actions above set forth respondent engaged in a course of subtle opportunism and took advantage of every situation to discredit the Union and support the B-Line revival, thus violating the cited sections of the statute.

Accepting at their fullest value the evidential findings of fact, both those of the examiner approved by the Board and those specifically made by the Board, we think that this order is invalid as a matter of law. There is no substantial evidence that the respondent discouraged membership in the Union. The factory is small, and has no history of labor trouble. When respondent became aware of the C. I. O.'s effort to organize its plant by passing leaflets at the gate in the fall of 1940, respondent's president at once called the foremen and advisory employees in a conference, and instructed them "To keep their hands off the labor situation," that is, "Not to advise for or against." These instructions were repeated periodically in foremen's meetings and in December, 1940, the following announcement was placed on the bulletin board:

"Notice."

"So that there may be no doubt in the mind of anyone concerning the attitude of this Company with regard to the rights of its employees, the following bulletin is being posted:

"Employees of this Company may join any labor organization of their own choosing. Also, they may refrain from joining any or all labor organizations, if such is their desire.

"The Company takes no position in the matter either one way or the other. Each employee must decide this question for himself or herself. Whether you belong or do not belong to a labor organization, you will be accorded the same treatment as any other employee.

"The National Labor Relations Act declares that 'Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.'

"This is the law of the land and the policy of this Company and our foremen have been specifically instructed to comply with this policy without any exception whatsoever.

"The Brown-Brockmeyer Company,
"By ......."

Slyer, representative of the Board, later insisted that the following sentence, "Whether you belong or do not belong to a labor organization, you will be accorded the same treatment as any other employee," be cut out of the notice, and the respondent eliminated the sentence.

No substantial evidence exists that respondent favored the initiation of the B-Line or openly favored it over the Union. The Board concludes that favoritism was shown by respondent's closing down its plant one-half hour earlier than usual to facilitate attendance at the B-Line organizational meeting of Novem-

ber 28, 1940. This meeting was held at a building not on the respondent's premises, was in no way financially assisted by respondent, and no supervisory employees participated. The eight-hour day of the plant was completed at four-thirty, but certain employees often worked until five. On November 28th a large number of employees left the plant at four-thirty when the regular whistle blew and the men were allowed to go or stay as they chose. While notices of the meeting were posted in the plant, no general order was given to employees to leave at four-thirty. One witness for the Board testified that his foreman, Daley, said nothing to him about the meeting, and another witness for the Board said that any one who wanted could stay and work. Foreman Baldasare is said to have stated that the plant would close at four-thirty for the meeting. There is no testimony that any one was ordered to leave, although there is evidence that it was suggested that employee Midlam ought to go to the meeting "to see what it was about anyway." We think this constitutes no evidence of coercion or favoritism. The conceded fact is that operations could not be conducted efficiently after a large number of the employees had left. The Board found this to be the case, and for this precise reason held that respondent was not to be censured for not working the last thirty minutes of the eight-hour day on August 20, 1942. The same conditions of operation existed on November 28, 1940.

The ruling that the taking of individual polls of the employees, as shown by this record, constituted an unfair labor practice, is not supported by the law or the evidence. The polls taken as to working on holidays (December, 1941), and as to overtime work of women (February, 1942) were taken not with reference to the rate of wages, the regular hours of work, or any other matter covered by the contract with the Union. They covered the one point of the attitude of the employees on overtime. The Board concedes that the respondent was free to grant as little or as much overtime as it pleased. Neither the Union nor the employer could force an employee to work overtime or work on holidays, and therefore the question of their willingness to do so was a subject upon which the employer was entitled to question the individual employees. The respondent had a right to publicize the requests of the Army and

Navy and to make a check of the employees' views on the matter, partly in performance of its duties of wartime cooperation and partly as a matter of business efficiency. To apply to the Union for assistance in working on holidays or to the State Department of Industrial Relations for permission to work women overtime would have been futile unless a majority of the employees could be counted on for cooperation. The plant could not be operated unless most of the employees worked, for the work is passed on conveyors from one part of the plant to another in a continuous operation, and the absence of many employees holding strategic positions along the conveyor line would leave only a few of the plant's operations which could be performed. As a practical matter, therefore, a great deal of overtime could not be given to the men unless the women could also work overtime.

Nor was it an unfair labor practice for the respondent to state in its letter of September 15, 1942, that the C. I. O. was responsible for the rescission of the permit for women to work overtime. The respondent's letter dealt with the facts of the controversy, and therefore fell "within that area of free discussion that is guaranteed by the Constitution." Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093.

The Board's finding that the respondent's letter stating that the order permitting the women to work overtime was rescinded owing to opposition by the C. I. O. group was "a statement which the respondent knew was not in accord with the facts," has no support in the record. The respondent had written the State Department of Industrial Relations on February 20, 1942, applying for permission to have the women employees work overtime. This letter reads in part as follows:

"At the time of making our request, on December 24, 1941, we had intended working our women 9 hours a day and not to exceed 6 days per week, but a great deal of objection was raised by a shop committee representing the United Electrical, Radio & Machine Workers of America Union, who have bargaining rights in our Shop. When this objection was voiced, we discontinued the overtime and we made a careful survey of the majority of our female workers and of all the employees contacted, there was just one employee

who objected to overtime. We understand that this employee appeared at a hearing which you recently held at Columbus and voiced protest to working female help overtime.

"From the survey which we made of our female help, they have all indicated, with this one exception, a desire to help in the war effort by working some overtime and to support this statement, we shall be glad to have you send an inspector if you deem it advisable, to check this statement."

It was testified, and not contradicted, that an inspector came to the plant as requested and told the management that permission for women to work overtime had been refused because of a protest. The uncontradicted facts show in sequence the granting of permission by the State Department of Industrial Relations in January, 1942; the protest of the Union against overtime for women in the agenda of grievances at the plant, February, 1942, and the refusal of extension of permission by the State Department, March 4, 1942. Respondent was informed by the inspector that "there had been a protest made." In compliance with the inspector's instructions respondent asked the United States Employment Office for additional women employees, but it could not furnish the needed help either in numbers or in quality of service. Respondent was justified in concluding that the protest came from the Union, and that it had a direct relation to the refusal. It therefore had a right to say so. National Labor Relations Board v. Virginia Electric & Power Co., 314 U. S. 469, 62 S.Ct. 344, 86 L.Ed. 348; National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, 915, certiorari denied 312 U.S. 689, 61 S.Ct. 621, 85 L.Ed. 1126; Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800, 804; Jacksonville Paper Co. v. National Labor Relations Board, 5 Cir., 137 F.2d 148, certiorari denied, 320 U.S. 772, 64 S.Ct. 84.

■ We think this conclusion is required by the cited cases, even if respondent was mistaken in its belief that the C. I. O. was responsible for withdrawal of the privilege. The right of free speech does not depend upon the accuracy of the ideas expressed. If respondent honestly ascribed the loss of privilege to the protest of the Union, it was entitled to express that belief, and no testimony in this record sustains the finding that respondent's statement in the letter of September 15th was not honestly made.

■ But the finding relied upon by the Board as establishing that the respondent knew the statement was false is not supported by substantial evidence. The trial examiner found that the time of the conference was before Pearl Harbor (December 7, 1941). The Board evidently relies upon this finding in its condemnation of the respondent's letter. It is true that Pearl James testified that she went to Columbus for the conference before Pearl Harbor; but this witness is vague and incoherent in her testimony and qualifies her statements with such phrases as "The best I can remember." However, she twice gives testimony which, read fairly with the context, constitutes a positive statement that she went to Columbus for the conference after the women worked overtime at the factory. The record shows this question and answer: "Well, they had been working overtime, hadn't they? A. The week before that [the conference] they had. * * *" At another point she states in effect that "the girls had been asked to work" more than eight hours a day "only the two weeks before that [the conference]." Christ, president of the Union, states positively that the women worked only eight hours a day up to January 1, 1942. We take judicial notice that the pressure for the elimination of overtime restrictions, both on men and women, was intensified after the entrance of the United States into the war. It is plain, upon consideration of Christ's uncontradicted and definite testimony with that of Pearl James, that the Columbus conference took place between the time when respondent sent the letter of February 20, 1942, requesting the privilege of overtime work for women, and the refusal of the Department on March 4th.

■ While Steffen Brown, Sr., respondent's president, Steffen Brown, Jr., respondent's vice president, and some of respondent's employees made certain derogatory remarks against the Union, growing mainly out of the difficulty as to working holidays and overtime, they were made without threat or coercion. No threat or intimation of a threat to any union member or to any workman contemplating union membership is presented. In fact only one employee, Edith Rowland, was shown to be laid off during this period,

and her discharge was found by the Board to be not unlawful. An employer has the right of freedom of speech and may express his hostility to a union and his views on labor problems or policy, providing he does not threaten or coerce his employees. National Labor Relations Board v. Virginia Electric & Power Co., supra; National Labor Relations Board v. Ford Motor Co., supra; Midland Steel Products Co. v. National Labor Relations Board, supra; Jacksonville Paper Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Citizen-News Co., 9 Cir., 134 F.2d 970, 971.

■ The Board also found in effect that Steffen Brown, Jr., favored the B-Line because in his answer to Robert Luckey as to the possibility of securing overtime he declared, "As long as we have this labor dispute we can't do much about it." The Board concluded that "In view of the fact that there was no labor dispute pending at this time, we find that Brown, Jr.'s reply was intended to place upon the Union the onus for the respondent's failure to work overtime, an accusation which was wholly unwarranted." This conversation took place about Christmas, 1941, after the Union had refused to waive double pay for Thanksgiving. We think that the statute does not intend to hold business men not trained in the law to subtle distinctions as to what is or is not a labor dispute within the meaning of the adjudications; and in any case the statement does not constitute an unfair labor practice. It contains no threat or coercion, and is not unlawful, being protected by the constitutional right of free speech.

The inequity of the situation obtaining with reference to employers who were doing war work, compelled to observe the price ceiling as of September 1, 1938, and at the same time to pay double time for holiday work in face of the urgent requests of the Army and Navy for the use of holidays in order to speed up production, is shown by the fact that the President on September 9, 1942, issued a directive prohibiting payment of double pay on holidays, and requiring all holiday work thenceforth to be compensated at time and a half instead of double pay.[1] The importance of speeding up war work in plants where women work with men, subject to restrictions of the Ohio Code, was shown by the fact that in 1943 the Code's prohibition as to working hours for women was relaxed by the Ohio Legislature.[2]

The petition to enforce is denied.

[1] Executive Order 9240, 40 U.S.C.A. § 326 note,—Regulations relating to overtime wage compensation:

"Whereas many labor organizations have already adopted the patriotic policy of waiving double time wage compensation or other premium pay for work on Saturday, Sunday and holidays, as such, for the duration of the war; and

"Whereas it is desirable and necessary in the prosecution of the war, and to insure uniformity and fair treatment for those labor organizations, employers, and employees who are conforming to such wage policies that this principle be universally adopted:

"Now, therefore, by virtue of the authority vested in me by the Constitution and the statutes, as President of the United States and as Commander in Chief of the Army and Navy, it is hereby ordered:

"I. That the following principles and regulations shall apply for the duration of the war to the payment of premium and overtime wage compensation on all work relating to the prosecution of the war:

\* \* \* \* \* \* \*

"B. No premium wage or extra compensation shall be paid for work on customary holidays except that time and one-half wage compensation shall be paid for work performed on any of the following holidays only:

New Year's Day
Fourth of July
Labor Day
Thanksgiving Day
Christmas Day

and either Memorial Day or one other such holiday of greater local importance."

[2] "The provisions of G.C. §§ 1008-1 to 1008-3 shall not apply to the employment of females and minors for the period beginning May 14, 1943, to April 1, 1945, or such earlier date as the governor shall by proclamation determine to be the end of the emergency created by the war." Act May 14, 1943, 120 Ohio Laws, p. ——. See Gen.Code Supp. 1943, § 1008-1.