NATIONAL LABOR RELATIONS BOARD
v. ELYRIA TELEPHONE CO.

No. 10176.

Circuit Court of Appeals, Sixth Circuit.
Dec. 14, 1946.

Thos. E. Shroyer, of Washington, D. C. (David A. Morse, A. Norman Somers, Morris P. Glushien, Joseph B. Robison and Robert E. Mullin, all of Washington, D. C., on the brief), for petitioner.

Wm. P. Clyne, of Cleveland, Ohio (William Patrick Clyne, of Cleveland, Ohio, on the brief), for respondent.

Before ALLEN, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The National Labor Relations Board, petitioner, issued on May 1, 1945, its complaint, on charges filed by a local union of the International Brotherhood of Electrical Workers (AFL), against the Elyria Telephone Company, respondent, alleging unfair labor practices by the respondent in the violation of Section 8(1) and Section 2(6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 152(6, 7), 158(1). It was charged that, from January 1, 1945, to the date of the issuance of the complaint, the respondent attempted to persuade its employees to withdraw from the Union by notifying them that it was granting a retroactive wage increase and that they might withdraw from the Union without being penalized under the closed-shop provision of the contract between the respondent and the Union. After proper notice, a hearing was held at Elyria, Ohio, before a Trial Examiner. The petitioner put on four witnesses, but the respondent did not call any.

The Trial Examiner filed his intermediate report, finding that respondent had engaged in unfair labor practices, and recommended the entry of a cease and desist order and the granting of other relief embraced in the National Labor Relations Act. No exceptions to the report were filed, and no oral argument before the National Labor Relations Board was requested. The Board adopted the findings, conclusions and recommendations of the Trial Examiner, and issued on August 21, 1945, its order to the respondent to cease and desist from the unfair labor practices and to post appropriate notices. On January 2, 1946, the Board filed its petition for enforcement of its order.

From the findings of the Labor Board, it appears that, in March 1943, the Union negotiated its first contract with the respondent covering the employees of the traffic department, who are alone concerned in this proceeding. These employees are long distance telephone operators. The contract term was effective retroactively from January 1, 1943, for the period of one year, and was to continue in effect from year to year thereafter, unless either party desiring changes should notify the other in writing at least 60 days prior to the annual renewal date. Among other things, the contract provided for a closed shop, forbade any work stoppage by strike or lockout, and established a wage scale. Subsequently, upon the agreement of the respondent and the Union and with the approval of the War Labor Board, a wage revision was made.

Around October 24, 1944, the Union informed the respondent in writing that it desired to change the terms of the traffic department contract, which had been automatically renewed for the year 1944; and, shortly thereafter, submitted a memorandum of proposed changes.

On November 17, 1944, the traffic department employees commenced a sit-down strike, which lasted for eight days. Many months before, they had gone on a strike for less than a day. The respondent sent the following telegram, dated November 22, 1944, to the Union's international president: "This is to notify you that the telephone operators of this company, members of your local 1014 have been on sit-down strike since last Friday. Also a group of plant department employees are on strike who are members of your organization. We will refuse in the·future to enter into any closed shop contract with you since you have violated your present contract on two occasions and will consider our present contract void unless your members return to work by five P.M. Wednesday the 22nd."

The Union had been certified on October 17, 1944, as the bargaining agent of respondent's plant department employees. Negotiations on a contract for these employees were undertaken; but, when, on December 12, 1944, an impasse had been reached, the Union requested that negotiations on the proposed changes in the traffic department contract be begun. The respondent, however, expressed a desire to complete the negotiations on the plant department agreement before discussing amendment of the traffic department contract, for the reason that general matters affecting all its employees might be determined in the plant department negotiations and subsequently incorporated into the traffic department contract.

On January 5, 1945, a conciliator from the United States Conciliation Service was called in to meet with the respondent and the Union. At this meeting, according to the uncontradicted testimony of James E. Reilly, the Union's representative, it was agreed that, inasmuch as the traffic department employees were under contract, automatically renewable from year to year, the Union need have no apprehension about the fact that the new contract had not been consummated; and assurance was given by the company that it desired the contract to remain in effect during the time necessary for consummation of an agreeable contract concerning the plant department. He testified further that this assurance was given by counsel for the respondent and was confirmed by its general manager.

After executing the plant department contract on February 16, 1945, the respondent and the Union turned their attention to the contract for the traffic department. During the various negotiations, respondent offered, among other things, to give all employees in the traffic department an increase in pay of two and one-half cents an hour. It was agreed, also, that the new traffic department contract would be given retroactive effect to January 1, 1945. The wage increase was included in a proposed contract, prepared by the respondent and submitted to the Union. At the last meeting on February 27, the Union and the respondent were in agreement, according to the testimony of Reilly, upon all the general terms of the contract and had reached an understanding to submit to the War Labor Board five disputed matters, namely, union security provisions, overtime pay, calling time, pay for work on Monday after Sunday holiday, and severance pay. Reilly testified that, at this time, the Union did not agree to the respondent's proposal of a two and one-half cents an hour increase for all employees; that he had expressly stated that he was not in a position to answer the proposal until after he had discussed the matter with the Union; and that it was not until he had done so that, on the following day, February 28, he had informed the conciliator of the Union's acceptance of the offer.

As to unfair labor practices, the Trial Examiner found, and the Board adopted his findings, that after the close of the meeting on February 27, 1945, but before the Union had agreed to the two and one-half cents wage increase offered by respondent to the traffic department employees, the respondent, having knowledge through a petition circulated on February 22, 1945, that a considerable group of the traffic department employees were disposed to withdraw from the Union, sought to undermine further the strength of the union by announcing, without giving credit to the Union for its negotiating efforts, that the respondent was granting a wage increase. In support of this conclusion, there is substantial evidence in the record.

Mary Harrison, recording secretary of the Union and an employee of respondent for more than nine years, testified that Mrs. Williams, supervisor in charge of the traffic department, called the witness to her desk and told her that "she [Mrs. Williams] had to tell every girl, individually, that Mr. Ammel [General Manager] was going to give us a two and a half cent raise after January 1, 1945, and whether we belonged to the Union or not, we would not be penalized." She testified further that Mrs. Williams "went down the line and told all the girls about the two and a half cent raise."

The finding of the Trial Examiner that the action of the supervisor in so doing had the effect of discouraging union membership and activity is borne out by the Union Secretary's testimony. She said that the supervisor's statement sounded to her as if it meant that the employees would receive the raise, whether or not they were members of the Union; and that they would not be penalized for being non-union members, so there would be no benefit to be derived from union membership.

██ Marie Stankard, who had been an employee of the company for five years and was President of the Union, corroborated the testimony of Mary Harrison as to the statements and activities of Mrs. Williams, whom she described as Chief Operator of the traffic department and "boss over the girls". As such, she gave them their instructions, made out their work schedules, gave them their "time off", and never, herself, worked at the switchboard. According to the witness, though she knew that the Union was "trying to negotiate a raise", her first knowledge of the respondent's offer came through the supervisor's statement to her. Admittedly, Mrs. Williams was a supervisory employee. The Board correctly held, in supporting the Examiner, that the respondent is accountable for her statements and activities. International Ass'n of Machinists v. National Labor Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Colton, 6 Cir., 105 F.2d 179, 181; National Labor Relations Board v. Tennessee Products Corporation, 6 Cir., 134 F.2d 486; National Labor Relations Board v. American Creosoting Co., 6 Cir., 139 F.2d 193, 195.

Marie Stankard testified that she asked Mrs. Williams: "What do you mean, we won't be penalized for not belonging to the Union? We have a contract that is in effect. It is a closed shop, and we have to belong to a Union." According to the witness, Mrs. Williams replied: "I don't know anything about that. That is what I was told to tell you." Later, the supervisor brought Marie a copy of the telegram of November 22, 1944, in which respondent had advised the Union's international president that it would consider the present closed shop contract void unless the striking employees returned to work. Mrs. Williams described the telegram as "Mr. Ammel's answer." After Mrs. Williams had talked over the telephone with General Manager Ammel, the telegram was placed on the company's bulletin board, where it remained for about two weeks.

The Trial Examiner found, and we think justifiably, that by the posting of this telegram the respondent further emphasized its pronouncement to the employees that they were not required to continue to be members of the Union.

The conclusion of the Trial Examiner that the respondent had knowledge, through a petition circulated on February 22, 1944, that a considerable group of the traffic department employees were disposed to withdraw from the Union was based on the testimony of Mildred Trieskey that, on the specified date, she and "some of the older girls" made up and circulated a petition that they did not want to continue their Union membership and then, "two or three days later", submitted it to Robinson, president of the respondent company. Fourteen of the 33 employees in the traffic department signed the petition. Asserting that Mr. Robinson is President of the Elyria Savings & Trust Company, as well as president of the telephone company, the attorney for respondent contends that the petition was delivered to Robinson in his office at the bank building for safe-keeping. He asserts that the Board charged the respondent with knowledge of the petition on this

innuendo, and argues that there is no evidence that Robinson knew of the contents of the petition. It is true that there is nothing in the record to show that Robinson read the petition or that Mildred Trieskey or the other girls told him of its contents. Moreover, on cross-examination, Mildred admitted that the circulation of the petition and the conversation relative to it was had only with people who were in the Union as distinct from the officers, agents, or supervisors, of the respondent company. On the other hand, she declared: "I think one of the girls told me perhaps it would be better, you know, if we didn't have it. She said she thought I ought to give it to Mr. Ammel. I said that I knew Mr. Robinson pretty well. I said that I would take it to him, he would keep it for us." It would appear to be a natural inference to be drawn by the Trial Examiner and the Board that, as the petition involved a telephone company matter, the president of that company read it after it had been presented to him. Robinson did not take the witness stand. The failure to call him was explained by the respondent as due to the fact that he was in a hospital at the time of the trial, and afterwards died.

An argument stressed by respondent is that, in the meeting of Febraury 27, 1945, Reilly, as negotiator for the Union, accepted the two and one-half cents wage increase; and that, therefore, there was nothing wrong in announcing to the employees what had already been agreed upon by the respondent and the Union. The evidence does not support the argument. Reilly, the only person present at the meeting who testified, asserted positively that an agreement had not been reached on the wage increase, as it was necessary for him to submit this matter to the Union for discussion. The two company representatives who attended the meeting, Ammel and Cline, did not take the stand. Even if an agreement had been reached respecting the wage increase, collective bargaining negotiations had not ceased and no contract had been executed. This was the reasonable inference of the Trial Examiner and of the Labor Board.

From the foregoing evidence, the Board, in adopting the findings and conclusions of the Trial Examiner, concluded that in the circumstances the respondent company should have refrained from action which would influence its employees "in their organizational desires", or in voting on the wage proposals; and that, with knowledge of the anti-union petition which had been circulated, the respondent "sought to undermine further the strength of the Union by announcing, without giving credit to the Union for its organizing efforts, that the respondent was granting a wage increase." It was pointed out, moreover, that, despite the current closed-shop provisions of the extended 1943 contract and the pendency before the War Labor Board of the Union security provision of the 1945 contract then being negotiated, the respondent told its employees that their job security would not be impaired by non-union membership; and that, by posting the old telegram of November 22, 1944, it was further sought to emphasize the pronouncement of the respondent to its employees "that they did not have to remain members of the Union". This was regarded as an "undercutting" of the authority of the Union as the chosen representative of the employees, interfering with, restraining and coercing them in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.

██ The conclusions of the Trial Examiner and the Labor Board are amply supported by authority. National Labor Relations Board v. Knoxville Pub. Co., 6 Cir., 124 F.2d 875, 881. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 44, 57 S.Ct. 615, 627, 81 L.Ed. 893, 108 A.L.R. 1352, in which the Supreme Court said that "the obligation to treat with the true representative [of the corporation's employees] was exclusive and hence imposed the negative duty to treat with no other." See also Virginian R. Co. v. System Federation, 300 U.S. 515, 548, 549, 57 S.Ct. 592, 81 L.Ed. 789.

Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 684, 685, 687, 64 S.Ct. 830, 88 L.Ed. 1007, is closely in point. There, the employer, while negotiating with a collective bargaining agent, was interviewed by 12 of its employees who were members of the Union.

They stated that they and six other members had no desire to belong to the Union, if, through their own efforts, they could obtain specified wage increases. The employer negotiated an agreement with them. This conduct was held to be in violation of Section 8(1) of the Act. Chief Justice Stone added that it was unquestionably an unfair labor practice for the employer, in response to the offer of its employees, to induce them by the grant of wage increases to leave the Union; and that the defection of union members, which the employer had induced by unfair labor practices could not justify its refusal to bargain with the Union even though, as the result of the separate bargaining, the Union no longer had the support of the majority of the employees.

The opinion of the Supreme Court in May Stores Co. v. Labor Board, 326 U.S. 376, 383, 384, 385, 386, 66 S.Ct. 203, 209, leaves no doubt as to the correctness of the decision of the Labor Board in the instant controversy. In that case, it was held that the National Labor Relations Board was justified in finding that an employer, in seeking approval by the War Labor Board of wage increases for its employees, without bargaining collectively with their certified representative, was guilty of an unfair labor practice. It was pointed out that the employer was not getting into position to negotiate with the bargaining agency, but had declared and proposed that as employer the company would make the wage increase if permission could be obtained. The Supreme Court declared: "By going ahead with wage adjustments without negotiation with the bargaining agent, it took a step which justified the conclusion of the Board as to the violation of Section 8(1). Such unilateral action minimizes the influence of organized bargaining. It interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent. * * * We find no basis for eliminating the announcements or the publication from consideration on the ground that they were an exercise of the right of free expression, secured by the First Amendment. They are a part of the totality of Company activities and were properly received by the Board as evidence of the unilateral action of the employer. National Labor Relations Board v. Virginia Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 348, 86 L.Ed. 348.

From its first pronouncement in Midland Steel Products Co. v. National Labor Relations Board, 113 F.2d 800, 804, this court, in reviewing orders of the National Labor Relations Board, has carefully protected the constitutional guarantee of freedom of speech, to employers as well as to employees, where no coercion, interference, or restraint on the part of the employer has been shown. National Labor Relations Board v. Ford Motor Co., 114 F.2d 905, 914, 915, certiorari denied, 312 U.S. 689, 61 S.Ct. 621, 86 L.Ed. 1126; National Labor Relations Board v. Brown-Brockmeyer Co., 143 F.2d 537, 542; National Labor Relations Board v. West Kentucky Coal Co., 152 F.2d 198, 202.

We adhere to our views, strongly held, that the National Labor Relations Act does not inhibit the free expression of an employer to his employees of his views on labor policies, provided the employer is innocent of the coercion, interference, or restraint forbidden by the statute. But here, as in National Labor Relations Board v. Hal Peterson, et al., 157 F.2d 514, decided by this court on October 16, 1946, we find that the Labor Board was justified in deciding that the employer transcended the appropriate limits of free speech and perpetrated unfair labor practices, as revealed in the record.

The petition of the National Labor Relations Board for enforcement of its order is granted as prayed; except that there shall be included in the order the following sentence: "Nothing in our order hereinafter set forth shall be taken to prescribe conduct of the respondent protected by the proviso to Section 8(3) of the Act." At the argument and in a subsequent filed statement filed, the attorney for petitioner agrees that this amendment should be appropriately made.