In the Matter of R. H. MACY & Co., INC., Petitioner, against NEW YORK STATE LABOR RELATIONS BOARD et al., Respondents.

Supreme Court, Special Term, New York County, June 16, 1948.

*Leon Lauterstein, Joseph F. Finnegan* and *Marvin Fenster* for petitioner.

*William E. Grady, Jr., Philip Feldblum* and *Sidney Forscher* for respondents.

*Samuel P. Shapiro* for Retail, Wholesale & Department Store Employees, Local 1-S, C.I.O., *amicus curiæ*.

HOFSTADTER, J.   The petitioner, R. H. Macy & Co., Inc., moves for an order setting aside a decision and order of the respondent New York State Labor Relations Board, finding the petitioner guilty of an unfair labor practice within the meaning of subdivision 10 of section 704 of the State Labor Relations Act (the Labor Law) (referred to as the Act) and ordering it to cease and desist.   The respondent by cross motion applies for enforcement of its decision and order.   For convenience the petitioner will be referred to as Macy and the respondent as the board.

An understanding of the issues before the court requires a somewhat detailed statement of the facts out of which the controversy arises. Macy operates a large department store in the heart of New York City. Until the latter part of June, 1946, Macy maintained its own delivery service. The delivery employees, about 1,000 in number, were members of United Department Store Delivery and Interior Employees of Greater New York, Local 1, C. I. O., which will be referred to as Local 1. Since 1937, Macy had a collective bargaining agreement with Local 1, and negotiations for the renewal of this agreement had been completed about a week before June 22, 1946.

On June 22, 1946, Macy sold its delivery service and equipment to United Parcel Service, an organization which conducted delivery service for many of the city's well-known department stores. This step was taken in the interest of efficiency and economy and Macy's right to take it is not questioned. On June 24, 1946, Macy by letter informed its delivery service employees of the sale and that their employment with Macy would end on June 26, 1946, but that their future employment by United Parcel Service, with conditions as favorable as those they had enjoyed at Macy's, and protection of their seniority rights had been assured. This was the first notice to Local 1 or the delivery service employees of the sale.

On June 27, 1946, Macy's former delivery employees entered the employ of United Parcel Service. United Parcel Service had a collective bargaining agreement with an A. F. of L. union, Local 804, which provided for a closed shop. The former Macy employees refused to join Local 804, but joined another A. F. of L. teamsters' local. Local 804 objected to this move and as the result of the ensuing jurisdictional dispute the former Macy employees on July 10, 1946, left the employ of United Parcel Service and on July 11, 1946, began to picket Macy. In this picketing they were joined by persons employed by other stores and represented by other unions. The establishment of this picket line precipitated the happenings on which the present controversy hinges.

Besides its agreement with Local 1, already mentioned, Macy also had an agreement with Retail, Wholesale & Department Store Employees, Local 1-S, C. I. O., which was the collective bargaining representative of various categories of employees in the selling and nonselling departments. This Local 1-S, which will hereafter be designated as the union, is affiliated with the same international union as Local 1. On May 10, 1945, Macy and

the union had entered into a written collective bargaining agreement for a term of three years, beginning retroactively on February 1, 1945. This agreement was in effect in July, 1946, at the time of the focal occurrences in this case, except insofar as affected by these occurrences themselves. The agreement of February 1, 1945, contained the following no-strike clause: "During the term of this agreement, the Union and the members of the Union will not cause, sanction or take part in any strike (whether sit-down, stay-in, sympathetic, general or of any other kind), walkout, picketing, stoppage of work, retarding of work or boycott, whether of a primary or secondary nature, or any other interference with the operation and conduct of the Employer's business. The Employer agrees that there shall be no lockouts during the term of this agreement."

For several days after the commencement of the picketing on July 11, 1946, the attitude of the union toward the situation was somewhat equivocal. It is clear on the record that the union was fully aware that the no-strike clause in its agreement prohibited its participation in the picketing. Though the union took no formal action during this period of indecision, the membership was not forbidden by those in authority to engage in the picketing. The union's policy was expressed in the answer given by its president to the question whether to cross the picket line: "Let your conscience be your guide."

After the picket line was set up, the union's officials met from day to day with the officials of the international and discussed whether the union should join in the picketing. Finally, on July 17, 1946, after the international had given approval to this course and had also pledged its financial support, the union at a general membership meeting unanimously adopted a resolution by which it allied its members with the picketers.

The resolution recited the international's full support of " the strike of Local 1 against Macy's ", the setting up of a joint strategy and negotiating committee, consisting, among others, of representatives of the union, and the pledge of this committee " that there will be no settlement of the strike until the demands of Locals 1, 1-A and 1-S are agreed upon." The resolution announced four demands of the union, among them, " that we be paid for all the time lost during the strike ". It was then resolved that:

" (2) all members of Local 1-S will refuse to cross Local 1 picket line till all the demands of Local 1, 1-A and 1-S are agreed upon,

"and finally, all members of Local 1-S will actively participate in picketing and in such other activities as may be required."

By this resolution and the action taken in effectuation of its purpose the union became a full and active participant in the "strike of Local 1". The legal implications of these steps will be discussed later.

It is appropriate also to note that the union's constitution provides for discipline, through fine, suspension or expulsion of any member found guilty of the following offenses:

"(b) Willful violation of any provisions of collective bargaining agreements between the Union and employers."

"(g) Acting in a manner harmful to the interests and welfare of the Union and/or its members."

"(k) Refusing to obey a strike call of the Union or its authorized officers."

After the adoption by the union of the resolution of July 17, 1946, its president warned the members that the union would take action against any violating the resolution. On learning of the union's resolution, Macy the same day distributed the following notice to its employees: "We assure you that no Macy employee will lose his or her job by reason of Union action for working at this time while there is a picket line at the store."

Macy likewise on July 17, 1946, announced through the public press that "extra compensation was being provided for those who had stayed at work on the theory that they had to work harder because of the absence of so many of their fellow employees."

Between July 11 and July 17, 1946, a substantial number of union members did not report for work because of their unwillingness to cross the picket line. After the resolution of July 17, 1946, a very much larger group of union members absented themselves. Many of these joined the picket line, while others simply remained away from their posts. About 500 members of the union reported for work.

It is abundantly established that during the period of the strike, more especially after July 17, 1946, Macy could not and did not function normally. Its building was practically surrounded by a thick picket line, the presence of which drew thousands of others to the vicinity. There were mass demonstrations and disorder-provoking incidents. Though no arrests were made, unquestionably the scene was one of turmoil, if not of actual strife, and the atmosphere was fraught with tension.

This, in general, was the situation. Soon after the events of

July 17, 1946, the parties entered on conferences and these finally resulted in an agreement made on July 19, 1946, embodied in a letter addressed by Macy to the unions and to the former delivery employees and signed by all the parties to the dispute. Because of its direct bearing on the crucial questions now before the court, it becomes necessary to quote in full some of the provisions of this settlement agreement.

" Our undertakings hereinafter set forth are contingent upon the immediate and complete settlement of the current strike and all issues raised by any of the above named parties in connection therewith and the discontinuance of all picketing and work stoppage or other interference with the operation and conduct of Macy's business by any of the above named parties on or before 12:00 o'clock noon, Saturday, July 20, 1946; and the acceptance of membership in Local 804 of the Teamsters Union, A. F. of L., by all Former Macy Delivery Employees who desire to work for United Parcel Service. * * *

" 2. Macy agrees that if the Macy employees return to work by 12 o'clock noon July 20, 1946 or their first regularly scheduled work day thereafter there will be no layoff attributable to the strike. This provision shall not be deemed to restrict or prevent layoffs of employees for operating reasons not attributable to the strike. * * *

" 4. Subject to the condition hereinafter expressed, Macy agrees that it will pay to its employees who were absent from work by reason of picketing of Macy premises their usual compensation for their regularly scheduled work hours during the period from Thursday, July 11, 1946 to and including Saturday noon, July 20, 1946.

" The foregoing agreement is made upon the express condition that it shall not be deemed a precedent nor a waiver or impairment of any of Macy's rights under its existing collective bargaining agreement with the International, Local 1-S or Local 1-A."

Paragraphs 1 and 3, not set out in full, bind Macy to enter into a supplemental agreement making provision, in the case of sale or lease of a department for the assumption by the purchaser or lessee of the collective bargaining agreement and the recognition of the union therein named as the collective bargaining agent, and to sit down with the unions' representatives to review the wage structure, without, however, committing itself to reopen existing wage provisions.

On July 22, 1946, Macy's president issued a letter to all Macy's employees in which he reported the settlement of the dispute.

This letter, wholly conciliatory in tone, contains the following: "Macy's appreciates deeply the outstanding performance of the several thousand employees who operated the store during the crisis. While such splendid spirit cannot be measured in financial terms, all staff employees who worked during the period of the picketing will receive an extra two days pay for each day worked, as a token of our appreciation for the exceptional burden they carried."

On July 24, 1946, the union filed with the board a charge of unfair labor practices by Macy based on the July 22, 1946, announcement of the extra two days' pay to those who had worked during the strike. It may be noted, parenthetically, that as soon as Macy learned of the union's objection to the payment, it withheld distribution of the checks already prepared and has since been holding the sum of $243,994.31, the extra payment promised and which it stands ready to pay, pending the outcome of this proceeding.

On November 22, 1946, the union filed an amended charge, on which the board on March 31, 1947, issued its complaint in which the board charged Macy with discouraging membership in a labor organization by discrimination in regard to terms and conditions of employment in violation of subdivision 5 of section 704 and with interfering with, restraining and coercing its employees in the exercise of the rights guaranteed by section 703, in violation of subdivision 10 of section 704 of the act. After the service of Macy's answer, hearings were held before a trial examiner who took testimony and heard extended argument. The trial examiner issued his intermediate report on July 10, 1947, in which he found that Macy had not engaged in the unfair labor practices charged and recommended the dismissal of the complaint. On exceptions to his report filed by the board and the union which had participated in the hearings before the trial examiner, argument was heard by the board itself on September 10, 1947. Thereafter the board on January 21, 1948, made the decision and order now before the court, in which the board held that Macy had by the announcement of July 22, 1946, restrained and coerced its employees in the exercise of the rights guaranteed by section 703 of the act and thereby engaged in an unfair labor practice within the meaning of subdivision 10 of section 704 of the act. The board held further that Macy had not discouraged membership in a labor organization or engaged in an unfair labor practice within the meaning of subdivision 5 of section 704 and dismissed so much of the

complaint as alleged this unfair labor practice. The decision was by a majority of the board, the chairman dissenting and finding that the complaint should be dismissed in its entirety.

When the matter came on for argument before the court, the union applied for leave to intervene as a formal party to the proceeding. Macy interposed no objection. The board, however, objected to such intervention in reliance on *Amalgamated Workers* v. *Edison Co.* (309 U. S. 261) and *Matter of N. Y. State L. R. Bd.* v. *Holland Laundry* (294 N. Y. 480). In view of the position so taken by the board, the court denied the application for intervention but permitted the union to file a brief as *amicus curiæ,* and the union has availed itself of the permission so given.

It is, of course, established law that the findings of the board, if sustained by substantial evidence are conclusive on the court. (*Matter of Stork Restaurant, Inc.,* v. *Boland,* 282 N. Y. 256, 267; *Met. Life Ins. Co.* v. *Labor Relations Board,* 280 N. Y. 194, 209.) The converse is, of course, equally true. If the court is persuaded that the board's order does not rest on substantial evidence, it must annul the order. Study of the record satisfies the court that there is no material issue of fact in this case. Indeed, many of the facts lie in the contemporaneous writings of the parties themselves. The most important of these writings are the collective bargaining agreement of May 10, 1945, between the union and Macy, the union's resolution of July 17, 1946, Macy's release of the same day expressing its intention to give extra pay to those who stayed at work, the settlement agreement of July 19, 1946, and Macy's announcement of July 22, 1946.

The no-strike clause in the collective bargaining agreement is explicit and it is not seriously argued here that the union's resolution of July 17, 1946, was not a breach. Macy was within its rights in taking action against this breach by the union. The board's majority opinion recognized Macy's right in the circumstances and expressly found that the July 17, 1946, announcement of extra pay for those who stayed at work was not an unfair labor practice. This declaration accords with the settled principle that unlawful concerted activity is not entitled to the protection of the act (*Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31; *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240). A strike in violation of a contract is within the condemnation of the principle and a union which engages in such a strike may not complain of the employer's countermeasures (*Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; *Timken Roller Bearing Co.* v. *N. L. R. B.,* 161 F. 2d 949; *United Biscuit Co.* v. *N. L. R. B.,* 128

F. 2d 771; *Fafnir Bearing Co.*, 73 N. L. R. B. 1008; *Joseph Dyson & Sons, Inc.*, 72 N. L. R. B. 445).

Of course, the July 17, 1946, announcement was something more than empty words. It was a commitment by Macy to its employees. If the announcement was not an unfair labor practice when made it would seem to follow inevitably that Macy had the right in good faith to meet the commitment and to fulfill the pledge which the announcement carried. Yet though the board upheld Macy's right to make the pledge it pronounced an unfair practice the later attempt to carry it out. Strictly, the board's decision applied only to the July 22, 1946, announcement of two days' extra pay. However, as will be shown, the necessary effect of the decision was to deny Macy's right to perform its promise of July 17, 1946. Since the board's conclusion commands respectful attention the reasoning by which it attained its result requires careful analysis.

The discussion of every one of the reasons given by the board for its decision would extend this opinion beyond permissible limits. The court must, therefore, confine itself to the main or underlying grounds stated by the board in its opinion and urged before the court in support of the decision and order under review. Basically, the board's decision rests on its view that by entering into the settlement agreement of July 19, 1946, Macy condoned the union's admitted breach of contract and waived any right to predicate future action on such breach. From this premise the board reasoned that on July 22, 1946, the agreement with the union was again in full force and that the extra pay, if any, for those who worked during the strike was a subject for collective bargaining, which Macy was not free to determine unilaterally.

In the court's opinion there is nothing in either the language of the July 19, 1946, agreement or in the circumstances surrounding it to justify the sweeping effect thus claimed for it. True, Macy by permitting the return to their jobs of those who had participated in the stoppage, and by agreement that " there will be no layoff attributable to the strike ", and further, that the absentees should receive their usual compensation during the period from July 11 to July 20, 1946, at noon, did forego some of its rights. It gave up its undisputed right to discharge and to refuse to reinstate the absentees. But it by no means follows that Macy thereby surrendered every other right. Not alone is there nothing in the July 19, 1946, agreement to support the construction so placed on it, but there is in its

language clear implication of a contrary intent. As already noted, the agreement was made on the express condition that it was not to be deemed a "waiver or impairment of any of Macy's rights under its existing collective bargaining agreement". The board brushed aside this provision as "a mere saving clause" which in nowise affects Macy's "obligations on the question at issue".

Specific and explicit language of a written agreement is not to be disregarded so lightly. It is evident that this saving clause was put in the agreement for a purpose. To treat the agreement as an unlimited waiver, without reservation of any rights at all, is to make this clause idle and meaningless. Read in accordance with the elementary rule of construction, which requires that effect be given to every provision of a written agreement, the clause goes a long way to impair, if not wholly to destroy, the validity of the interpretation of the July 19th agreement as an all-inclusive waiver which took from Macy the freedom in good faith to meet its pledge of July 17, 1946, to those who remained at work during the strike. Such interpretation, in the court's opinion, extends the scope of the agreement beyond the meaning fairly and reasonably to be drawn from its text.

The doctrine of waiver seems inapposite to the situation for other reasons. Ordinarily a right is waived. Here, what the board decides has been waived was an obligation as well as a right. Though the promise of extra pay may not have been sufficiently definite to be legally enforcible — even this assumption is not necessarily correct — it was nonetheless a clear moral commitment which those to whom it was directed had every right to expect Macy to discharge. When the board held that Macy had by the agreement of July 19, 1946, deprived itself of the power to discharge this commitment, it held that Macy had bargained away not alone its own rights but also the rights, albeit inchoate, of those to whom the commitment was made.

The holding that, once the agreement of July 19th was signed, Macy was bound to discuss with the union the amount to be paid in fulfillment of the promise of July 17, 1946, leads to still another difficulty. In July, 1946, Macy's clerical force had not yet been organized and the union was not the bargaining representative of the office employees. These employees were also affected by the announcement and the board in its opinion states that "as to them Respondent (Macy) was under no duty to discuss the amount of the extra pay with the Union". If,

however, Macy was bound, as the board decided, to bargain collectively with the union regarding the extra pay for the union members, where did this leave the nonmembers? Presumably in the discussions the union would have urged that the nonmembers receive no better, while Macy would have argued that they receive no worse treatment than the members. The union's probable attitude in the negotiations may be gleaned from the charge lodged by it with the board which culminated in the order now under review. The extra pay of the nonmembers would thus be made dependent, in large measure, if not wholly, on the union's will, dictated by its policy to discourage work during a strike which it has called, lawfully or otherwise. For all practical purposes the union would then have become the bargaining representative for the nonmembers on the subject of their extra pay. The anomaly of such a situation speaks for itself.

The court does not hold that Macy could not by express agreement or conduct effect a waiver broad enough to bring about this result. What it holds is that the text of the July 19, 1946, agreement contains no such waiver, and that, in view of the far-reaching consequences of such a waiver, it is not to be implied from equivocal circumstances. Accordingly, the court must reject the board's conclusion that omission of a provision for the extra pay from the settlement agreement evidences an intent to leave this matter to future negotiation between the parties. It is established both by concession and by the board's finding, and is admitted in the board's answer in the present proceeding, that the union, during the settlement discussions, knew that Macy intended to give extra pay to those who had worked. In this situation, Macy's failure to inject the topic into the negotiations is no more significant than the union's like failure. If there was a duty to bring the matter up, the union, forewarned of Macy's intention, was certainly under as compelling a duty to do so as Macy. The suggestion in the board's decision that there was a " studied avoidance " by Macy of its duty to consult with the union finds no support whatever in the record. An inference drawn from the silence of either party in these circumstances is nothing more than a guess.

Since Macy's announcement of extra pay on July 17, 1946, was concededly not an unfair labor practice, and Macy did not by the settlement agreement or otherwise renounce the right to act on the announcement, it follows that Macy was within

its rights in fixing the amount of the extra pay on July 22, 1946. The discharge of a prior commitment, lawfully entered into, in such a situation is not forbidden unilateral action constituting an unfair labor practice.

Though the court holds that Macy was entitled to fix the amount of extra pay without consulting the union, in so doing Macy was bound to act in good faith.

While Macy's good faith is not alone unchallenged but clearly recognized in the board's decision, the board nevertheless placed its finding of an unfair labor practice on the further ground that the amount of the extra pay was so disproportionate as in itself to constitute an unfair practice. If the failure to consult the union on the amount of extra pay was an unfair practice, it was so irrespective of the amount of the extra pay and the amount does not affect the case at all. The board, however, stressed this phase of the case at such length that it cannot be passed over.

The board stated that since Macy's express justification for the extra pay was extra work rendered, the "burden was, therefore, properly upon it to justify *two days'* extra pay." (So in original.) The law, however, does not place the burden of justification on an employer charged with an unfair labor practice. The law puts the burden where it properly belongs, on the accuser (*Matter of Stork Restaurant, Inc.*, v. *Boland*, 282 N. Y. 256, *supra*; *N. Y. State Labor Relations Bd.* v. *Shattuck Co.*, 260 App. Div. 315, 321). Not alone did the board proceed on an initially erroneous assumption, but its finding that the extra pay was in fact excessive is wholly without support in the record.

The conditions under which those who continued at work cannot be lost sight of. The estimates of the number of those at work inside the store varied from 10% to 40% of the normal contingent. There can be little doubt that the store was heavily undermanned and that, despite the inevitable falling off of attendance and volume of business in such circumstances, the burden of those engaged in the store's operations was increased, both by the absence of fellow-employees and by the necessity of performing unaccustomed tasks. Besides the extra effort and labor, they also suffered the strain of working under these trying conditions. They had to face and pass through the picket line. The union members were confronted with the perplexity whether to stand by the union's agreement with their employer or to leave their posts and risk union expulsion and its effect on their future livelihood. The impossibility of

appraising with mathematical certainty the value of service rendered in these unusual circumstances is self-evident.

The board held, however, that the extra pay was excessive. Its reasoning is in reality merely an amplified statement of its view that Macy did not affirmatively satisfy the board of the fairness of the amount, a burden not resting in Macy under the act. Apparently the board would have measured the amount by other standards, which, so it thought, would have been more accurate. It emphasized the importance of the time element as an index in fixing additional compensation. The board also expressed the opinion that Macy did not have to wait until July 22, 1946, after the settlement of the strike, to determine how much, in its business judgment, it should set aside for the extra pay. The value of the service, not the duration of the strike, should determine the extra compensation and there was no reason why Macy could not have announced the rate before it did. The length of the strike had no bearing on fixing the extra pay, the board said. These rulings of the board are so contrary to every-day experience that they must be rejected. The duration of the strike had a very direct bearing on the extra pay in at least two very obvious respects. The longer the strike lasted, the greater the physical and nervous strain on those who continued at work. The overall cost of the extra payment was dependent on the number of days for which the payment was to be made. Surely these were elements properly to be taken into account by management in fixing the amount of extra pay. Yet it is only by first shifting the burden of justification to Macy, and then excluding these factors from consideration, that the board was able to find the extra pay excessive.

It should be noted in passing that the so-called two days' extra pay was not exactly what the phrase implies. Since the picketers and absentees received a day's pay without any work, in fairness the payment of a single day's wage to those who remained at work merely equalized their status with that of the nonworkers. In reality then the proposed payment was not triple pay at all. When it is recalled that very generally overtime is paid at one and a half, and Sunday and holiday work at twice the regular rate it cannot be said that the payment at double the regular rate for work done under the abnormal conditions prevailing at the time is so excessive as to stamp it, as the board has done, a reward for passing the picket line.

There is the further intimation in the board's decision that the proposed extra pay was in the nature of a reprisal against

the absentees, " an indirect way of punishing the strikers for picketing." Macy was, in the board's view, " attempting to keep an uneven balance " between the workers and the non-workers. The vice of this suggestion is that, not alone is there no evidence to support it, but it loses sight of the fact that the absentees themselves, not Macy, created the two classes of employees. The situation not being of Macy's making, Macy had the right, so long as it paid the strikers and indulged in no lay-offs forbidden by the settlement agreement, to pay the nonstrikers more for working than it paid the strikers for not working. This was not unfair discrimination.

If the loyalty of those who remained at work also entered into the computation, the proposed payment does not for that reason become an unfair practice. The act does not take from an employer the right to compensate in recognition of loyal services.

Finally, the majority found the extra pay announcement an unfair practice because at the time the union was engaged in a campaign to organize the office employees. In point of fact, Macy on October 29, 1946, agreed to conduct a card count, the card count showed that the union represented a majority, and on November 4, 1946, Macy entered into an agreement covering the office workers. The board absolved Macy of bad faith and there is not a scintilla of evidence that the extra pay announcement had the remotest relation to the union's campaign. To tie the announcement to the campaign is pure speculation. If an employer's lawful conduct wholly unrelated to a union's activity may be adjudged an unfair practice because of its possible but unintended effect in the distant future, then the employer, however well disposed, makes any move in his dealings with his employees at the hazard of later being held guilty of an unfair practice. In the court's opinion the act is not to be extended to such unreasonable limits.

The many cases cited in support of the board's order have not been overlooked. They do not apply, for they are distinguishable on their facts. (See *May Stores Co.* v. *Labor Board,* 326 U. S. 376; *Medo Corp.* v. *Labor Board,* 321 U. S. 678; *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332; *N. L. R. B.* v. *Elyria Telephone Co.,* 158 F. 2d 868; *Pure Oil Company,* 73 N. L. R. B. 1; *Hudson Hosiery Co.,* 72 N. L. R. B. 1434.)

The court is not insensible to the dilemma which confronted the absentees. Even before the union's July 17, 1946, resolution, the union members had to choose between adherence to

the no-strike clause of the collective bargaining agreement and crossing the picket line. After that date their problem was more baffling. The union constitution made both violation of a collective bargaining agreement and disobedience of a strike order punishable offenses, a plain contradiction in the conditions then existing. Exposed to the pressure of these conflicting loyalties, what was the choice to be? This was the question each worker had to answer for himself. Undoubtedly the problem posed was more trying for the union members than the nonmembers. Many, taking what appeared at the time to be the line of least resistance, responded to the strike call, either by active picketing or by simply not reporting for work. Others, fewer in number and possibly of sturdier fibre, at the risk of the scorn of their associates and in the case of union members at the added risk of union discipline, steadfastly remained at their posts. It is not the court's province to blame or commend either group. The court merely holds that, the strike having admittedly been illegal and the July 17, 1946, promise of extra pay a permissible and lawful countermeasure, Macy's later effort in good faith to redeem the promise was not an offense under the act. There is no evidence that Macy's conduct was inspired by any purpose other than to carry out in a fair spirit a commitment it felt itself in honor bound to meet. What it did in this emergency was not a violation of the act.

This holding is necessarily confined to the facts of this case. What might be held in other circumstances or in another setting has no bearing here. On the facts in this record the board's decision and order are without basis and must be annulled. The petitioner's motion to set aside the decision and order is granted; the cross motion for enforcement is consequently denied. Settle order.